Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/17/2020 08:08 AM CDT

Mary A. Jones, appellant, v.
Curtis L. Jones, appellee.
___ N.W.2d ___

Filed April 23, 2020.    No. S-18-093.

1.  **Modification of Decree: Appeal and Error.** Modification of a dis-
    solution decree is a matter entrusted to the discretion of the trial court,
    whose order is reviewed de novo on the record, and will be affirmed
    absent an abuse of discretion by the trial court.
2.  **Judges: Words and Phrases.** A judicial abuse of discretion exists if the
    reasons or rulings of a trial judge are clearly untenable, unfairly depriv-
    ing a litigant of a substantial right and denying just results in matters
    submitted for disposition.
3.  **Modification of Decree: Child Custody: Proof.** Ordinarily, custody
    of a minor child will not be modified unless there has been a material
    change in circumstances showing either that the custodial parent is unfit
    or that the best interests of the child require such action.
4.  ____: ____: ____. The showing required to modify custody is a two-
    step process: First, the party seeking modification must show a material
    change in circumstances, occurring after the entry of the previous cus-
    tody order and affecting the best interests of the child. Next, the party
    seeking modification must prove that changing the child's custody is in
    the child's best interests.
5.  **Modification of Decree: Words and Phrases.** A material change in
    circumstances is the occurrence of something which, had it been known
    to the dissolution court at the time of the initial decree, would have per-
    suaded the court to decree differently.
6.  **Modification of Decree: Child Custody.** If a change in custody is to be
    made, it should appear to the court that the material change in circum-
    stances is more or less permanent or continuous and not merely transi-
    tory or temporary.
7.  **Modification of Decree: Child Custody: Evidence: Appeal and
    Error.** Even when a finding of a material change in circumstances is

not expressly made by the trial court, an appellate court, in its de novo review, may make such a finding if the evidence supports it.

8. **Modification of Decree: Child Custody: Evidence: Time.** As a general rule, when determining whether the custody of a minor child should be changed, the evidence of the custodial parent's behavior during the year or so before the hearing on the complaint to modify is considered most significant.

9. **Child Custody.** When determining the best interests of the child in the context of custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. Other relevant considerations include stability in the child's routine, minimalization of contact and conflict between the parents, and the general nature and health of the individual child. No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case.

10. **Child Support.** All orders concerning child support, including modifications, should include the appropriate child support worksheets.

11. ____. Attaching a child support worksheet to the child support order allows the trial court to show the parties, and the appellate courts, that it has "done the math" required by the child support guidelines.

12. ____. The purpose of setting nominal support is to maintain information on the obligor in the child support system and, hopefully, encourage such person to understand the necessity, duty, and importance of supporting his or her children.

13. **Child Support: Rules of the Supreme Court.** The absence of a child support worksheet requires the parties and appellate courts to speculate about the trial court's conclusions and calculations in awarding support; therefore, even in very low income cases, courts awarding nominal support under Neb. Ct. R. § 4-209 (rev. 2020) should attach a child support worksheet, and the reason for any deviation from the minimum support amounts required by § 4-209 should be contained either in the court's decree or order or on worksheet 5.

Petition for further review from the Court of Appeals, Moore, Chief Judge, and Riedmann and Welch, Judges, on appeal thereto from the District Court for Lancaster County,

Andrew R. Jacobsen, Judge. Judgment of Court of Appeals affirmed in part, and in part reversed and remanded with directions.

David V. Chipman, of Monzón, Guerra & Associates, for appellant.

Mark J. Krieger and Terri M. Weeks, of Bowman & Krieger, for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Stacy, J.

In this appeal from an order modifying custody, the primary question is whether there was sufficient evidence of a material change in circumstances affecting the best interests of the minor child. The Nebraska Court of Appeals found sufficient evidence to support modifying legal custody, but not physical custody.[1] It also found the evidence did not support the need for a safety plan addressing parental substance use. On further review, we reverse only that portion of the Court of Appeals' opinion pertaining to the modification of physical custody. In all other respects, we affirm.

## I. BACKGROUND

Mary A. Jones and Curtis L. Jones were married in 2003 and had one son, Kasey Jones, born in December 2004. Mary filed for divorce in 2005. The parties eventually entered into a property settlement and custody agreement that resolved all disputes. At the final hearing in 2006, the court approved the parties' property settlement and custody agreement in its entirety and entered a consent decree that awarded Mary legal and physical custody of Kasey, subject to Curtis' reasonable parenting time. The parties did not agree to a set parenting time

---

[1] *Jones v. Jones*, No. A-18-093, 2019 WL 446636 (Neb. App. Feb. 5, 2019) (selected for posting to court website).

schedule, and the original decree did not establish one. Curtis was ordered to pay monthly child support of $550.

### 1. Stipulated Modification of Custody

In 2011, Curtis filed a complaint to modify custody. He alleged there had been a material change in circumstances, in that Mary was no longer able to provide a stable and consistent environment for Kasey and the lifestyle in her home was no longer in Kasey's best interests. Eventually, Mary and Curtis entered into a written stipulation agreeing there had been "a material change in circumstances necessitating a change in the custody and support obligations" without elaborating on the nature of the changed circumstances. In November 2011, the court approved the parties' stipulation and entered a modified decree awarding them joint legal and physical custody pursuant to a week-on-week-off parenting schedule. Curtis' monthly child support obligation was reduced to $500. One year later, pursuant to another joint stipulation of the parties, Curtis' child support obligation was reduced to $257.

### 2. 2016 Complaint to Modify

Curtis filed the instant complaint to modify in April 2016, alleging there had been a material change in circumstances warranting a change in the joint custody arrangement. His complaint generally alleged that residing with Mary 50 percent of the time was no longer in Kasey's best interests because, since the last modification, Mary had failed to provide a stable and structured home for Kasey or properly care for his mental, physical, and educational well-being. Mary's answer denied these allegations and included a counterclaim seeking to increase Curtis' monthly child support payments.

### 3. Trial

In August 2017, the court held a 2-day trial on Curtis' complaint to modify custody and Mary's counterclaim to increase

child support. As pertinent to the issues before this court on further review, the following evidence was adduced.

### (a) Parties' Employment

When the parties divorced in 2006, Mary was working at a law firm. She resigned that position in 2007 to return to school, and in 2011, she earned a degree in paralegal studies. In November 2011, when the stipulated order modifying custody was entered, Mary was working part time as a paralegal and office manager. In 2012, she began working as a paralegal for a different attorney, earning $18 an hour, and it was during that period that the parties stipulated to a reduction in Curtis' child support obligation. Mary continued working in that position until 2014, when the attorney was suspended.

For the next 3 years, Mary was basically unemployed, and the testimony at trial provided no clear explanation for why she was unable to obtain employment. In the months leading up to trial, Mary applied for approximately 25 different jobs, and in May 2017, she began working 10 hours per week as a caregiver, earning $9 per hour. Two weeks before trial, Mary started a second temporary job, working part time for an attorney, entering client data into a legal software program.

Curtis has worked as a drywaller for the past 25 years. He currently owns his own drywall business and has a steady income. Curtis remarried in 2014, and his current wife has worked for the same employer for the past 23 years. Curtis has a flexible work schedule that allows him to take time off work when necessary.

### (b) Parties' Substance Use

Both Mary and Curtis have a history of substance use. Mary denied any current substance use, but she admitted using controlled substances in the past. Mary testified that in 2011, she was being routinely drug tested and someone from the Nebraska Department of Health and Human Services lived in her home "[t]wenty-four hours a day for one year" to make sure she "stayed on the straight and narrow." It was during

this time period that the parties agreed to change Mary's primary physical custody of Kasey, and move to a joint legal and physical custody arrangement with week-on-week-off parenting time.

Curtis also admitted to abusing alcohol and using controlled substances during the parties' marriage. He testified that he stopped consuming alcohol when Kasey was about 2 years old and stopped using controlled substances shortly thereafter.

At trial, there was no evidence that either party is currently abusing alcohol or controlled substances. Both parties submitted to court-ordered testing for illicit drugs and alcohol, and the tests were negative.

(c) Mary's Health

Mary testified that she has been diagnosed with "ADD/ADHD," bipolar disorder, and Lyme disease. She also suffers from chronic back pain. In addition to taking prescribed medication for these conditions, Mary is prescribed an antidepressant and regularly treats with a mental health practitioner. There was no evidence that any of Mary's health issues have directly impacted her ability to parent, nor did Mary testify that her health issues have interfered with her ability to obtain or keep stable employment.

(d) Parties' Housing

At the time of the stipulated modification in 2011, Mary lived in her own residence. At some point, her boyfriend moved in and helped pay the rent, but Mary admitted that he was not a good influence on Kasey. Her boyfriend used marijuana and was verbally, mentally, and physically abusive to Mary. Following an assault in 2014, Mary obtained a domestic abuse protection order against her boyfriend and he was removed from the residence.

In 2015, Mary was evicted from her residence. She lived with friends for a month or two after the eviction, then moved in with her adult daughter and lived there for another couple of

months. Mary then moved again, living in a friend's basement for about a month.

In the fall of 2015, Mary moved in with her adult son, Kash Wolff (Kash). She testified that because she had lost her job and lost her car, she "needed to rely on him for a while." Kash had a job and usually paid their rent and all of their monthly household expenses. Mary admitted that Kash had anger control issues and caused physical damage to their residence and to property within the residence, but Mary fixed what she could and did not believe Kasey noticed the damage. Mary described Kash as an alcoholic, admitted he used drugs, and testified that he frequently allowed his friends to live with them for weeks at a time. Mary admitted that some of Kash's friends were not a good influence on Kasey and that she asked them to leave, but she testified that it was "hard" since Kash was "trying to be nice and give them a place to stay."

Mary described one time when she discovered Kash's friend was storing stolen property, including a shotgun, in their garage. She called the police and reported the stolen property, and shortly thereafter, a bullet was shot into their residence and lodged in Mary's headboard. Initially, Mary testified that Kash's friend "shot at me because I turned him in," but later, she testified that "[i]t could have been somebody shooting a BB — or a gun back there at animals."

Mary lived with Kash for nearly 2 years, but about 2 months before the modification trial, they were evicted for nonpayment of rent. At the time of trial, Mary had moved back in with her adult daughter and her daughter's boyfriend and minor child. Mary described her daughter's home as a stable and structured environment, but admitted the living arrangement was temporary. It is undisputed that during Mary's parenting time, Kasey lived wherever, and with whomever, Mary was living.

At the time of the custody modification in 2011, Curtis was still living in the same residence where he and Mary had lived during their marriage. In 2014, Curtis remarried and built a

new home, where he currently lives with his wife, her two daughters, and Kasey.

### (e) Child's Testimony

Kasey was 12 years old at the time of trial. He testified in chambers with his parents' counsel present. The district court assured Kasey that his testimony would not be shared with his parents, and the parents' attorneys were similarly admonished. We have considered Kasey's testimony as part of our de novo review, but we will not summarize it here other than to say it is clear that he loves both his parents and wants to spend time with both of them.

### (f) Child's Health and Welfare

The evidence at trial was undisputed that Kasey is a healthy, well-adjusted teenager who is involved in appropriate activities, has meaningful friendships, and is doing well academically. He spends quality time with both his parents and has a strong and loving relationship with both. He also has a positive relationship with Curtis' new wife and her two daughters and with Mary's adult daughter and that daughter's child.

### (g) Parental Communication

The evidence at trial showed that since their divorce, Mary and Curtis have generally been cordial with one another and able to communicate effectively about most parenting issues. Curtis testified they struggle with some joint decisions, and he recounted a time when Mary needed money and demanded that Curtis pay her nearly $1,000 before she would agree to have Kasey attend a different elementary school. Curtis also testified that he and Mary had difficulty agreeing on holiday parenting time, because it was not addressed in the 2011 parenting plan.

### (h) Requested Relief

Curtis asked the court to award him primary legal and physical custody of Kasey, subject to Mary's parenting time on a "10/4" schedule during the school year and a week-on-week-off

schedule during the summer. Curtis believed Mary's housing situation had become chronically unstable and unsafe, and he felt it would be best if Kasey spent fewer overnights in that environment during the school year. Curtis asked that he be ordered to pay all of Kasey's expenses and that Mary not be required to pay any child support. Finally, Curtis asked that his existing child support obligation be terminated prospectively, but not retroactively.

Curtis submitted a proposed parenting plan reflecting this requested relief. His parenting plan also included a safety plan that prohibited Mary from consuming alcohol or narcotics during her parenting time, except as prescribed by a physician. The safety plan also provided that if Curtis believed Mary was under the influence of alcohol or drugs during her parenting time, he could "suspend or terminate" her parenting time until her sobriety could be confirmed.

Mary asked the court to continue the joint custody arrangement and the equal parenting time schedule. She also asked that Curtis' child support obligation be increased to $1,437 per month, based on his increased earnings since the last child support modification.

### 4. District Court Order

#### (a) Factual Findings

The district court made express factual findings about changes in Mary's housing, employment, and finances since the custody modification in 2011. We summarize those findings below.

#### (i) Housing

The court found that since 2011, Mary had experienced difficulty maintaining a stable residence in which to raise Kasey. It found she had moved five times, been evicted multiple times, and was generally dependent on others to pay her rent and living expenses. She had lived with 13 different people since 2011, some of whom were physically violent and many of whom were not a good influence on Kasey. The court was

particularly troubled with the environment in which Mary lived for most of the 2-year period leading up to the modification trial:

It is clear to the Court that [Mary] recognized that while living with Kash, having his friends stay for a week or two at a time in and out of the house was not a good situation for [K]asey, but because she had no other place to go, no employment, no other source of income, she was reliant on her 24-year-old son to provide her and [K]asey a roof over their head. Her objections to the people living there apparently were unsuccessful as the parade of people continued until they were eventually evicted. During this period of time, [Mary] testified that Kash was making bad decisions, was an alcoholic, was hanging out with bad people, making poor choices of friends and these were the very people that were residing with her and [K]asey . . . .

### (ii) Employment

The court found that after the modification in 2011, Mary had difficulty maintaining stable employment. She had seven different employers during that time period, and for several of those years—from the summer of 2014 through May 30, 2017—she was almost continuously unemployed.

### (iii) Finances

The court found that since 2011, Mary had incurred significant debt and had been sued multiple times by collection agencies, landlords, and businesses. It also found that because of her financial struggles, she had "left the financial care of the minor child to [Curtis] since the entry of the modification in November of 2011." The court found that a partial itemization of such expenses totaled more than $5,000, but that Curtis "ha[d] taken no action against [Mary] in an attempt to get her to pay her share of those expenses because he recognize[d] the precarious financial position that [she] has been in for the last several years."

### (b) Modification Order

The court modified the parties' joint physical custody and gave Curtis physical custody, subject to Mary's parenting time on a 10/4 schedule during the school year and a week-on-week-off schedule during summer break. The court also established a specific holiday parenting time schedule. The court found it was unnecessary to modify the parties' joint legal custody, but it did give Curtis final say in the event the parties reached an impasse and were unable to make a joint decision. Finally, the court terminated Curtis' child support obligation and ordered Mary to pay nominal child support of $10 per month.

The court attached, and incorporated into its modification order, the proposed parenting plan submitted by Curtis. It expressly found the modified parenting plan was in Kasey's best interests except for the proposed changes to legal custody. The modification order, which was prepared by counsel, did not include an express finding that a material change in circumstances justified modification of Kasey's physical custody.

### 5. Court of Appeals

Mary appealed. As relevant to the issues on further review, she assigned it was error for the district court to (1) modify physical custody, (2) modify joint legal custody by giving Curtis final say in the event of an impasse, (3) include a safety plan in the modified parenting plan, and (4) deny Mary's counterclaim seeking an increase in child support.

In its de novo review, the Court of Appeals examined the record for evidence of a material change in circumstances affecting the best interests of the child since the 2011 custody modification. It found insufficient evidence to warrant modifying physical custody, but sufficient evidence to modify legal custody.

The Court of Appeals thus reversed the district court's order to the extent it modified Kasey's physical custody, affirmed the order to the extent it modified joint legal custody to give

Curtis final decisionmaking authority, eliminated the safety plan, and remanded the cause for further consideration of Mary's counterclaim seeking to increase Curtis' child support obligation.

We granted Curtis' petition for further review.

## II. ASSIGNMENT OF ERROR

On further review, Curtis assigns only that the Court of Appeals erred in finding there was insufficient evidence of a material change in circumstances to support modifying physical custody.

## III. STANDARD OF REVIEW

[1] Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion by the trial court.[2]

[2] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[3]

## IV. ANALYSIS

### 1. Custody Modification

[3,4] Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing either that the custodial parent is unfit or that the best interests of the child require such action.[4] We have described this showing as a two-step process: First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and

---

[2] *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019).

[3] *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019).

[4] *Whilde v. Whilde*, 298 Neb. 473, 904 N.W.2d 695 (2017); *Hopkins v. Hopkins*, 294 Neb. 417, 883 N.W.2d 363 (2016).

affecting the best interests of the child.[5] Next, the party seek-ing modification must prove that changing the child's custody is in the child's best interests.[6]

Here, neither parent claimed the other was unfit. Consequently, we focus our review on whether Curtis has shown a material change in circumstances occurring after the 2011 modification and affecting Kasey's best interests, and whether Curtis proved that changing the custody arrangement was in Kasey's best interests.

(a) Material Change in Circumstances

[5,6] We have long described a material change in circum-stances as the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently.[7] We have also explained that if a change in custody is to be made, it should appear to the court that the material change in circum-stances is more or less permanent or continuous and not merely transitory or temporary.[8]

[7] We begin by noting, as did the Court of Appeals, that the district court made express factual findings concerning changes in Mary's employment and housing since the 2011 custody modification, but its order made no express find-ing that those changes were material and affected Kasey's best interests. The absence of this express finding is not dispositive, however, because we have recognized that even when a finding of a material change in circumstances is not expressly made by the trial court, an appellate court, in its de

---

[5] *Id.*

[6] *Id.*

[7] *VanSkiver, supra* note 2; *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015); *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015); *Heistand v. Heistand*, 267 Neb. 300, 673 N.W.2d 541 (2004); *Swenson v. Swenson*, 254 Neb. 242, 575 N.W.2d 612 (1998).

[8] *Hoschar v. Hoschar*, 220 Neb. 913, 374 N.W.2d 64 (1985), *disapproved on other grounds, Parker v. Parker*, 234 Neb. 167, 449 N.W.2d 553 (1989).

novo review, may make such a finding if the evidence sup-
ports it.[9]

Having reviewed the record de novo, we find ample evi-
dence that Mary's continuous unemployment and housing
instability combined to present a material change in cir-
cumstances after the 2011 modification that affected Kasey's
best interests.

### (i) Continuous Unemployment

The Court of Appeals concluded that Mary's unemploy-
ment after the 2011 modification did not amount to a mate-
rial change in circumstances, reasoning that she experienced
periods of unemployment before the 2011 modification too. It
is true that Mary experienced periods of unemployment before
2011, but the evidence generally showed those periods were
sporadic and included several years when Mary intentionally
left the workforce to further her education. When the stipulated
modification was entered in 2011, Mary had completed her
degree in paralegal studies and was gainfully employed as a
paralegal. She changed employers several times thereafter, but
generally held a steady job in the legal field until 2014, when
her employment situation changed significantly.

[8] From 2014 until shortly before trial in 2017, Mary
was almost continuously unemployed and her only source of
income was child support. This lengthy period of unemploy-
ment differed from the past, in that Mary was not unemployed
because she was changing jobs or furthering her education.
Mary did start working shortly before trial in this case, but
the jobs were part time and temporary and did not suggest a
commitment to returning to stable employment. And as a gen-
eral rule, when determining whether the custody of a minor
child should be changed, the evidence of the custodial parent's
behavior during the year or so before the hearing on the com-
plaint to modify is considered most significant.[10]

---

[9] *Parker, supra* note 8.

[10] See *Heistand, supra* note 7.

Despite Mary's history of sporadic and temporary unemployment before the custody modification in 2011, we agree with the district court that the continuous unemployment she experienced after 2014 amounted to a material change in circumstances. And it was a change in circumstances that negatively impacted her ability to provide safe and stable housing for Kasey, a concern we discuss next.

### (ii) Housing

The Court of Appeals expressed concern over Mary's housing instability and the questionable character of some of the individuals with whom she resided after the 2011 modification. But it ultimately concluded this evidence did not support a material change in circumstances, reasoning there was no evidence that the frequent moves or the presence of questionable individuals in the home "had any actual negative impact on Kasey."[11] Our de novo review leads us to a different conclusion.

We find it significant that at the time of the stipulated custody modification in 2011, Mary lived in her own residence and appeared to be providing a safe and stable living environment for Kasey. Someone from the Nebraska Department of Health and Human Services was living with her around the clock to make sure she "stayed on the straight and narrow," and there was no evidence of crime or violence in the home. Since that time, Mary's housing situation has changed significantly.

She has been evicted twice for nonpayment of rent. Her chronic unemployment left her unable to afford safe and stable housing, and she became dependent on the generosity of family and friends for a place to live. Mary moved residences four times in 2015 alone, and since 2011, she has lived with approximately 13 different people. Mary admits some of the people with whom she lived were not a good influence on Kasey, and the evidence bears that out.

---

[11] *Jones, supra* note 1 at *7.

For several years after the 2011 custody modification, Mary lived with a man who used illegal substances and who was verbally, mentally, and physically abusive to her. And from 2015 until a few months before trial in 2017, Mary lived with her adult son, who had a violent temper, was an alcoholic, used illegal drugs, and allowed his friends to live with them for weeks at a time. At the time of trial, Mary was living with her adult daughter, and while the environment in that home was considerably safer than Mary's prior residence, she admitted the arrangement was temporary. Mary was hopeful her circumstances would improve in the future, but she described no concrete plans for more permanent housing.

Mary's post-2011 living conditions were unstable and regularly exposed Kasey to living alongside people who were verbally and physically abusive to Mary, used illegal drugs, engaged in criminal activity, and had violent tempers. Mary did not believe that Kasey was affected by living in this environment, because he was still doing well in school, had positive relationships with his parents and peers, and regularly attended church with her. But we have rejected the suggestion that a parent must show that actual harm has befallen a child in order to establish that a modification of custody due to a material change in circumstances would be in the child's best interests.[12] And there is little doubt that if this unsafe and unstable living environment had existed and been brought to the attention of the court at the time of the 2011 custody modification, it would have persuaded the court to decree differently.

On this record, we find that Curtis met his burden of proving that Mary's continuous unemployment and chronic housing instability after the 2011 modification was a material change in circumstances that affected Kasey's best interests. We next consider whether the modified custody arrangement ordered by the district court was in Kasey's best interests.[13]

---

[12] See *Schrag, supra* note 7.

[13] See *Hopkins, supra* note 4.

(b) Best Interests of Child

[9] When determining the best interests of the child in the context of custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse.[14] Other relevant considerations include stability in the child's routine, minimalization of contact and conflict between the parents, and the general nature and health of the individual child.[15] No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case. The one constant is that the child's best interests are always the standard by which any custody or parenting time determination is made.[16]

Here, the district court found it was in Kasey's best interests for Curtis to have primary physical custody, subject to Mary's liberal parenting time on a 10/4 schedule during the school year and a week-on-week-off schedule during summer break. After our de novo review, we cannot find this was an abuse of discretion.

Since the 2011 modification, Curtis has had stable employment and a consistently safe and stable living environment for raising children; Mary has not. The district court left joint legal custody in place with additional provisions for resolving disputes, but placed primary physical custody with Curtis. It also changed the parenting time schedule to reduce the number of overnights with Mary during the school year, while still

---

[14] *Jeffery T., supra* note 3. See, also, Neb. Rev. Stat. § 43-2923(6) (Reissue 2016).

[15] See *Jeffery T., supra* note 3.

[16] See *id.*

affording liberal parenting time and allowing Kasey to spend equal time with both his parents over the summer months. We agree such a custody and parenting time arrangement is in Kasey's best interests.

### (c) Disposition

We thus reverse the Court of Appeals' finding that Curtis did not prove a material change in circumstances justifying modification of physical custody, and we remand the cause with directions to affirm the district court's modification of physical custody. We also direct the Court of Appeals to affirm the modified parenting plan approved by the district court, with two caveats.

First, for the sake of clarity, we direct the parenting plan be corrected to reflect that the parties maintain joint legal custody of Kasey, but that in the event they reach impasse and are unable to make a joint decision, Curtis shall have final say. Second, because we agree with the Court of Appeals that the record in this case does not support the need for a safety plan, we direct the safety plan provisions be stricken from the parenting plan.

### 2. Child Support Order

The district court terminated Curtis' monthly child support obligation and ordered Mary to pay nominal child support of $10 per month. No party takes issue with the amount of support ordered, but when the case was before the Court of Appeals, Mary assigned that it was error not to attach a child support worksheet to the order of modification showing how the support was calculated. Given the Court of Appeals' disposition, it did not reach this assignment of error. We exercise our discretion to consider it now, rather than directing consideration on remand.

[10,11] Neb. Ct. R. § 4-203(E) (rev. 2020) of the child support guidelines provides that "[a]ll orders for child support, including modifications, must include a basic income and support calculation worksheet 1, and if used, worksheet 2 or 3."

We have been clear that "[a]ll orders concerning child support, including modifications, should include the appropriate child support worksheets."[17] The appellate courts have repeatedly emphasized the importance of adhering to this requirement,[18] explaining that attaching the worksheet allows the trial court to show the parties, and the appellate courts, that it has "'done the math'" required by the child support guidelines.[19]

[12] In this case, the court ordered nominal support pursuant to the earlier version of Neb. Ct. R. § 4-209 (rev. 2020) of the child support guidelines, which provides that "[e]ven in very low income cases, except in cases of disability or incarceration where a lower amount may be justified, a minimum monthly support of $50, or 10 percent of the obligor's net income, whichever is greater, per month should be set." The purpose of setting nominal support is to maintain information on the obligor in the child support system and, "hopefully, encourage such person to understand the necessity, duty, and importance of supporting his or her children."[20]

We have not previously addressed whether a child support worksheet is required even when ordering nominal support under § 4-209, but we see no principled reason to depart from the settled rule, even in very low income cases. Admittedly, when nominal support is ordered in the recommended amount of $50, there is very little math to show. But in this case, it is not clear whether the $10 support figure was calculated based on a finding regarding Mary's net income or whether the court concluded that an amount lower than the recommended minimum was justified in this case. And of course, whenever there is a deviation from the child support guidelines, either the

---

[17] *Rutherford v. Rutherford*, 277 Neb. 301, 305, 761 N.W.2d 922, 926 (2009).

[18] *Id.*

[19] See *Stewart v. Stewart*, 9 Neb. App. 431, 434, 613 N.W.2d 486, 489 (2000). See, also, *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018); *Molina v. Salgado-Bustamante*, 21 Neb. App. 75, 837 N.W.2d 553 (2013).

[20] § 4-209.

reason for the deviation must "be contained in the findings portion of the decree or order, or worksheet 5 should be completed by the court and filed in the court file."[21]

[13] Because the absence of a child support worksheet requires the parties and appellate courts to speculate about the trial court's conclusions and calculations in awarding support, we hold that even in very low income cases, courts awarding nominal support under § 4-209 should attach a child support worksheet. And the reason for any deviation from the minimum support amounts required by § 4-209 should be contained either in the court's decree or order or on worksheet 5.

On remand, we direct the Court of Appeals to remand the matter to the district court with directions to prepare and attach an appropriate child support worksheet to the order of modification.

## V. CONCLUSION

For the foregoing reasons, we reverse the Court of Appeals' decision in part and remand the cause with directions to affirm the district court's modification of physical custody, child support, and the parenting plan, subject to the caveats set out above. In all other respects, we affirm.

Affirmed in part, and in part reversed
and remanded with directions.

---

[21] § 4-203.