IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

GREEN V. GREEN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

BRANDON L. GREEN, APPELLANT,

V.

ASHLEY N. GREEN, APPELLEE.

Filed September 17, 2024.    No. A-23-740.

Appeal from the District Court for Buffalo County: JOHN H. MARSH, Judge. Affirmed in part, and in part vacated and remanded with directions.

Jeffrey P. Ensz, of Lieske, Lieske & Ensz, P.C., L.L.O., for appellant.

Ashley Green, pro se.

MOORE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

INTRODUCTION

The marriage of Ashley N. Green and Brandon L. Green was dissolved by the Buffalo County District Court. The court's decree did not specifically award legal or physical custody of the parties' minor children, but it provided alternative parenting time arrangements that were conditioned on whether the parties lived within or beyond 20 miles of each other. The alternative parenting time schedules provided the equivalent of either the parties having joint physical custody or Ashley having primary physical custody; child support depended on which parenting time schedule was being exercised. Brandon appeals. We affirm in part, and in part vacate the portions of the decree conditioning parenting time and child support based upon the distance between the parties' homes. We remand with directions to amend the decree with regard to child custody, parenting time, and child support.

- 1 -

BACKGROUND

The parties were married in June 2016 and separated in February 2020. They have three minor children; the oldest was born in 2012, the youngest in 2018. Ashley and Brandon each have older children from prior relationships. Ashley filed a complaint for dissolution of marriage on March 17, 2022. Brandon filed an answer and counterclaim in response. In August, an order was entered awarding temporary joint legal and physical custody of the minor children to the parties, with an "alternating week" and holiday parenting time schedule. The district court's order indicated that the alternating week schedule had been followed by the parties since their separation. If the parties could not agree "after good faith discussion," Ashley would have final decisionmaking authority. Ashley was ordered to pay temporary child support of $484 per month for the three children. A contempt order was entered against Brandon in March 2023 for his failure to pay Ashley $1,396.11 for his share of unreimbursed medical and other expenses for the children as required under the temporary order. The order provided that he could "purge said contempt" if he made monthly payments of $100 towards the unreimbursed expenses.

Trial took place in July 2023. Both parties were living in separately owned residences in Kearney, Nebraska, at that time. The children have always lived in Kearney. Ashley acknowledged that the "joint physical situation," which alternated parenting time on a weekly basis, had been in place since the parties' separation in February 2020. She did not have any concerns with that arrangement until she learned that Brandon's teenage niece was living in his home. Ashley and Brandon had served as guardians to that niece "from either 2015 or 2016 until 2018," according to Ashley. She and Brandon agreed to have her removed from their care because of concerns about her hurting one of their children. According to Brandon, his niece had a "bad attitude initially" and she and Ashley did not get along. Brandon agreed to send his niece to live with his mother "to salvage [his] relationship" with Ashley. He never considered his niece a danger to his children. After the parties separated and Ashley learned that Brandon's mother and the niece were living in Brandon's home, she immediately filed her dissolution complaint in March 2022. In addition to her concerns about the niece, Ashley also had concerns about the way Brandon's mother was "raising my children." As examples of her mother-in-law's "immoral behavior," Ashley described how her mother-in-law would not allow the children to "Facetime [her] unless she's watching and they're in a specific room," and she withheld the children from Ashley when she went to pick them up. Brandon testified that Ashley never voiced an objection to his mother watching the children, and that Ashley had previously asked his mother to watch the children when she wanted to go out.

Ashley wants her children "involved in things," but she claimed that Brandon complains about driving them to practices or games being too long. Their daughters are involved in dance and gymnastics; their son is involved in various sports. Ashley said that Brandon did not think they had the time or the money for these activities, and she had to remind Brandon "like every day" to make sure the children got to their practices. Brandon acknowledged that they disagreed about some activities, such as "signing up for baseball this summer." Brandon "wanted to spend more time going to parks, doing things, family time." According to Brandon, their son did not "even want to play baseball." Brandon offered into evidence various family photos, including a "daddy-daughter night" event, a "matching pajamas" family photo, and a photo of Brandon with Ashley's son at his high school graduation.

Ashley works as a nurse "three nights a week," and each shift is "12-hour[s]." She finished nursing school in 2014 and then worked as an ICU nurse at a hospital in Kearney until 2020. When she and Brandon separated, she became a traveling nurse "because they pay more." At the time of trial, she was earning $38.50 per hour. During the COVID-19 pandemic, she had "two crisis contracts" that took her to Texas in 2021, from February to April, and again from October to November. Ashley said that Brandon kept the children, including her older son, for the "first contract," but he refused to take them for her second contract. She had to pay a "baby sitter lots of money" for her alternating weeks of parenting time. After those contracts, Ashley worked within a "45 to 50-mile radius in Nebraska." When she works during her week of parenting time, the children are either with her friends or sometimes her 17-year-old son watches them.

At the time of trial, Ashley was in school seeking a "Nurse Practitioner degree in Psychology." Her classes were through an "on-line university." She was "due to start clinicals in November [2023] for that" in Lincoln, Nebraska. She was "double-majoring," so she was "also doing aesthetics." An aesthetic nurse practitioner does "Botox, facial microdermabrasion, fillers, things like that." Ashley acknowledged having a "Facebook moniker . . . that's Aesthetic Barbie," and she advertises her services through social media. Her reason for moving to Lincoln was "the clinicals," although Omaha, Nebraska, would have been more "ideal" because she could have started her "aesthetics career" in Iowa without completing the degree she was "working on now." But she "thought Lincoln would be a nice kind of in between for Brandon and the kids, and I plan on making that extra drive, if needed, . . . so I can get started with . . . that side of my degree."

On cross-examination, Ashley admitted that she could do her clinicals and classwork for her nurse practitioner degree in Kearney. However, in Iowa, she could start "practicing as a nurse injector, building clientele, things of that nature," whereas in Nebraska, she would need her nurse practitioner degree "to start practicing those types of things." Ashley acknowledged that once she became a nurse practitioner, she could do aesthetics in Kearney, but that it was not "an ideal location to do this type of work," and that Lincoln or Omaha would be better for her to get clientele. Additionally, Ashley said that her "closest friends," whom she had known for "over three years," were all moving to Lincoln. She considered them "like family . . . like sisters," and so it was "kind of like a package deal situation . . . we all just want to support each other, be there for each other's kids and things like that." Also, Ashley said that she "can't keep doing what [she's] doing as a nurse in the hospital." She lost her brother "last year in an ICU, so it's really hard for [her] to keep working as a nurse in a hospital setting." Ashley acknowledged that she was planning to move to Lincoln "as soon as we get the Court's order[.]"

Ashley testified that she was looking to live in the "southwest part of Lincoln" because based on her research the schools in that area were "highly rated and look[ed] like good schools for the kids." Ashley was also preapproved to purchase a home in Lincoln. She believed that moving to Lincoln would provide "more opportunities and activities" for the children, and there would be "a more, like, diverse community that -- the kids have a lot of concerns about being here." When asked how things would change if the court left "it the same and it stays joint physical," Ashley responded that she would have to "readjust [her] goals and [her] future plans for school."

Brandon works as a manager at a restaurant in Kearney, having "worked [his] way up" from bartending to that position over his approximately 13 years of employment there. He

generally has 2 weekdays off and then works from 5 p.m. "until close" or "1 a.m." On slower days, he would arrive home between 1:45 and 2 a.m. and on busier days it could be between 2:45 and 3 a.m. On weekend days, he goes to work at 4 p.m. Aside from his paid time off, Brandon also has flexibility with his hours and can switch shifts with other managers in order to attend sports and other events. Brandon expressed his desire, and had begun the process, to establish his own business so that he could have more time to "be around the kids" during the day. Brandon objected to Ashley moving to Lincoln with the children, pointing out that "[t]hey grew up here." He said that all the children's friends were in Kearney, along with his older sons and their maternal grandparents, whom "they consider family." Brandon was concerned about how Ashley's moving would impact his parenting time and that the children would be "ripped away from their friends, that sense of normalcy from growing up here their whole lives, the home that they grew up in, the school that they're used to." He did not believe the schools in Lincoln would be better than the schools in Kearney, and he felt that Kearney was a "great place to raise a family," and a move would be a "step down."

Ashley did not believe Brandon was a "bad dad," but that "his demands for work and his schedule and things prevent him from being the best dad that he could be." And she also felt it was a "very bad decision on his part" to let his mother and niece stay with him.

The district court conducted an in camera interview with the parties' son, the oldest of the three children. He was 11 years old at the time and would be starting "middle school." He did not want to see anything changed in terms of the time spent with each of his parents. The court reported to the parties that their son was a "delightful youngster," and that they could "respond to a conversation, but not initiate one," presumably related to the court's in camera interview. The court said it did not see any "deal breakers either way in the conversation" and that the "child seems to have positive views of both parents." When discussing whether closing arguments were desired, Ashley's counsel asked if there was something specific the court wanted addressed. The court responded, "I don't see, you know, I guess if your client moves to Lincoln, the joint custody doesn't work anymore." The parties' counsel ultimately waived closing, either verbally or by brief.

A "Decree of Dissolution" was entered on August 21, 2023; Ashley's proposed parenting plan, exhibit 21, was attached. As relevant to this appeal, the decree stated:

The parties have been alternating physical custody with the children since 2020. There is evidence of poor communication and a lack of effective coparenting. Nonetheless, the minor children appear to be doing well in a shared custody arrangement. To their credit, the parties have blended families, each having children from a prior relationship. There is evidence that the parties continue to observe birthdays involving the step kids as a family.

The Court's preference would be to continue a joint physical custody arrangement. A joint custody arrangement is complicated by the mother's desire to move to Lincoln. The mother's reasons for her proposed move to Lincoln, while legitimate, are not particularly compelling.

The mother referenced violent interactions by the father during times that he was intoxicated. There is little corroboration for that allegation. There is some testimony that both parties have been violent towards each other. There was an incident in 2018 which resulted in the father receiving a chipped tooth from a strike or contact from the mother's elbow. The parties have differing versions of the incident. There is insufficient evidence to

apportion the fault of that now dated altercation. The Court declines to find credible evidence of abuse inflicted on any family or household member.

The Court finds that the mother has demonstrated a higher degree of stability providing for the care and education of the minor children. The father declined an opportunity to care of the children full-time while the mother was working in Texas during the Covid-19 pandemic in 2020. The father was previously held in contempt for failing to pay unreimbursed medical expenses.

In the event that the parties reside more than 20 miles apart, parenting time shall be in accordance with Exhibit 21, the mother's proposed Parenting Plan. If the parties reside within 20 miles of each other they shall continue to alternate parenting time on a weekly basis, alternating holidays as set forth in Exhibit 21.

Exhibit 21, Ashley's proposed parenting plan, provides for joint legal custody but gives Ashley sole physical custody of the children. The "parenting time" set forth in exhibit 21 provides Brandon parenting time every other weekend from Friday after school until Sunday at 5 p.m. He would also receive parenting time every Tuesday from after school until 7 p.m.; summer and holiday parenting time is also identified. The decree orders child support, but the amount and who pays depends on whether the parties live within or beyond 20 miles of each other. If within 20 miles of each other, Ashley would pay $167 per month in child support for three children. If beyond 20 miles of each other, Brandon would pay $747 per month in child support for three children.

## ASSIGNMENT OF ERROR

Brandon assigns that the district court abused its discretion regarding custody and parenting time.

## STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*. A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

## ANALYSIS

Brandon argues that the district court abused its discretion "in ordering an alternative custody arrangement based on potential, hypothetical geographical locations of the parties." Brief for appellant at 8. He contends that the court's order creates "an incentive for Mother to move more than 20 miles from Father," which then creates an "incentive for Father to responsively move within 20 miles of Mother." *Id*. He suggests that this "contingent parenting plan allows the parties to constantly flip-flop the parenting time and custody from a joint custody arrangement to a custodial/noncustodial arrangement simply by moving residences inside or outside the court's arbitrary 20-mile cutoff." *Id*. Brandon asserts that the court has "essentially placed a joint custody

versus sole custody arrangement in a potential state of constant flux and leaves that choice in the hands of the parties based on where they choose to reside." *Id*. at 10. He requests that we vacate the portion of the decree that grants Ashley "contingent physical custody and child support based on living a distance of over 20 miles" from Brandon. *Id*. at 11.

Ashley, pro se, responds that this appeal is "petty and unnecessary" and that she "will not be playing a game of flip flopping the children, as it is not healthy for them." Brief for appellee at 6. She states that "[t]his move could have easily been executed without moving the children outside of their school district due to the way the rural areas of Nebraska school districts work," but that she "chose not to move more than 20 miles from the father to benefit herself in any way such as financially in the form of receiving child support or legally in the form of receiving full custody." *Id*. However, she also indicates that she "will be finished with her Psychiatric Mental Health Nurse Practitioner . . . post masters degree in November of 2024 where she will pursue a career change which requires a move outside of Kearney[,] Nebraska[,] but within the state of Nebraska." *Id*. Ashley then cites to *Bohnet v. Bohnet*, 22 Neb. App. 846, 862 N.W.2d 99 (2015) (modification action involving intrastate move noting benefit of analysis under *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), but not requiring it). She requests that this court "keep[]" the . . . "decision on child custody and parenting time." Brief for appellee at 6.

The arguments of both parties suggest that they read the district court's decree to award them joint physical custody if they remain living within 20 miles of each other, but if Ashley moves more than 20 miles away from Brandon, Ashley would acquire sole physical custody. However, the decree does not expressly state this. While the decree addresses "parenting time," it does not address legal custody, nor does it make a specific award of physical custody. Under the Parenting Act adopted by the Nebraska Legislature, the concept of child custody encompasses both legal custody and physical custody. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). Where a parenting plan effectively establishes a joint physical custody arrangement, courts will so construe it, regardless of how prior decrees or court orders have characterized the arrangement. *Id*. "[I]t is the trial court's allocation of parenting time that drives the physical custody label, not the other way around." *Id*. at 948, 932 N.W.2d at 705. In *Kaaden*, the trial court awarded the father primary legal and physical custody of a minor child but awarded the mother nearly equal parenting time. The Nebraska Supreme Court determined that the trial court "effectively imposed a joint physical custody arrangement by creating a week-on-week-off parenting time schedule," and it proceeded to modify the language of the decree and parenting plan to reflect that holding. *Id*.

In this case, the district court notes that the parties have been "alternating physical custody with the children since 2020," and that despite "evidence of poor communication and a lack of effective coparenting," the children "appear to be doing well in a shared custody arrangement." This appears to be a reference to the parties' joint legal and physical custody arrangement that they had been exercising voluntarily and under the temporary court order for approximately 3½ years. The court then indicates a "preference" to "continue a joint physical custody arrangement," but states that such an arrangement "is complicated by the mother's desire to move to Lincoln." The court finds that Ashley's reasons for her proposed move to Lincoln were legitimate, but they were "not particularly compelling." There is no discussion of the best interests of the children related to legal or physical custody, other than perhaps being implicit in the court's finding that Ashley "has

demonstrated a higher degree of stability providing for the care and education of the minor children" and that Brandon declined a period of parenting time and had previously been held in contempt for failing to pay unreimbursed medical expenses.

The district court then proceeds to award "parenting time" based on the distance between the parties' residences being "within 20 miles" or "more than 20 miles" apart, effectively triggering an automatic change from the parties having joint physical custody to Ashley having primary physical custody. Ashley acknowledges this herself by arguing that such a "move could have easily been executed without moving the children outside of their school district due to the way rural areas of Nebraska school districts work," but that so far, she "chose not to move more than 20 miles from [Brandon] to benefit herself" by "receiving child support" or "receiving full custody." Brief for appellee at 6. Ashley construes the decree to authorize her to receive "full custody" simply by moving more than 20 miles away from Brandon, thus placing a change in custody and child support in her control by making such a move. Ashley appears to be interpreting the court's reference to "parenting time" being in "accordance with Exhibit 21" to mean that the court fully incorporated her parenting plan, including its reference to Ashley receiving sole physical custody of the children. However, the decree states only that "[i]n the event that the parties reside more than 20 miles apart, *parenting time* shall be in accordance with Exhibit 21, the mother's proposed Parenting Plan." (Emphasis supplied.) The decree references only the parenting time reflected in exhibit 21, it does not adopt and incorporate the entire parenting plan. However, it is evident that the effect of the parenting time schedule set forth in Ashley's parenting plan results in Ashley having primary physical custody.

There is also the matter of child support being in a state of flux as a result of the decree ordering child support based on which parenting time schedule is in effect. As Brandon points out, the change in child support "would not be self-executing" and "would require the parties to return to court to obtain an order for the same." Brief for appellant at 10. If Ashley moved more than 20 miles away from Brandon, child support would have to be modified. And if Brandon subsequently moved within 20 miles of Ashley, child support would again have to be modified. Ashley's assertion that she "will not be playing a game of flip flopping the children" may be genuine. Brief for appellee at 6. However, it remains problematic that this type of automatic changing of physical custody and child support based solely on the distance between the parties' homes places the control of custody and child support in the hands of the parties. And perhaps more importantly, such automatic modifications avoid any evaluation of the children's best interests at the time of each move.

Brandon correctly argues that it is the responsibility of the district court to determine questions of custody and parenting time according to the children's best interests. Under Nebraska law, the court is responsible for developing and approving a parenting plan. *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019). A trial court has a nondelegable duty to determine questions of custody and parenting time of minor children according to their best interests. *Id*. The authority to determine custody and visitation cannot be delegated to a third party, because it is a judicial function. *Id*. Nor can it be delegated to one of the parents. See *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018) (determining that parenting plan which allowed custodial parent right to end parenting time if other parent consumed alcoholic beverages was impermissible delegation of court's authority). We conclude the court abused its discretion by

delegating to the parties the ability to control physical custody, parenting time, and child support in this manner.

The district court's decree may also be construed as conditioning a change in physical custody, parenting time, and child support based upon the occurrence of a future action without regard for what the best interests of the children might be at that future point in time. And "if a judgment looks to the future in an attempt to judge the unknown, it is a conditional judgment." *Vogel v. Vogel*, 262 Neb. 1030, 1039, 637 N.W.2d 611, 619 (2002). "A conditional judgment is wholly void because it does not 'perform in praesenti' and leaves to speculation and conjecture what its final effect may be." *Id*. In *Vogel*, a district court entered an order addressing custody matters in the event the mother's new husband was transferred overseas, as well as addressing parenting time matters in the event the children's mother and father established residences within 50 miles of one another. The Nebraska Supreme Court concluded that "such orders are conditional in that they do not 'perform in praesenti' and become effective only upon the happening of certain future events which may or may not occur. Whether such orders will ever become effective is speculative." *Id*. Further, "[t]he impact of such potential events on the children's best interests and the proper judicial response to the potential events identified in the orders complained of are better assessed at the time of their occurrence." *Id*. at 1039, 637 N.W.2d at 619-20. The Supreme Court found such provisions to be void and severable from the valid portion of the order and ordered such portions vacated.

The district court's decree in this case can be somewhat distinguished from the speculative 50-mile order in *Vogel, supra*, because Ashley requested at trial to be able to relocate with the children to Lincoln as soon as a decree was issued. There was no speculation about her intentions with regard to where and when she wished to move. However, the decree did not specifically grant Ashley physical custody of the children and authorize her to move to Lincoln; rather, the decree broadly provided for a change in parenting time and child support in the event the parties lived within or beyond 20 miles of each another. Such language leaves open an unlimited number of future moves and would not allow for proper judicial consideration of the children's best interests at the time of each move. Beyond consideration of Ashley's express request to move to Lincoln, which the district court implicitly approved by referencing the alternative parenting time schedule, the decree as currently written allows for continuous future relocations for unknown purposes to unknown locations at unknown times, thus making this portion of the decree a void conditional judgment. See *Vogel v. Vogel, supra*.

We have determined that the portions of the decree allowing the parties to control physical custody, parenting time, and child support based upon the distance between their households was an improper delegation of authority to the parties, and in part, an improper conditional judgment. Further, the decree does not specifically award legal or physical custody of the children to either parent, which it must do, since the evidence establishes that neither party is an unfit parent. The standard for determining custody is parental fitness and the child's best interests. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006). When determining the best interests of the child in the context of custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5)

credible evidence of child abuse or neglect or domestic intimate partner abuse. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). Other relevant considerations include stability in the child's routine; minimalization of contact and conflict between the parents; and the general nature and health of the individual child. *Id*. No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case. *Id*. The one constant is that the child's best interests are always the standard by which any custody or parenting time determination is made. *Id*.

We vacate any portion of the decree conditioning parenting time and child support based upon the distance between the parties' homes, and we remand the case to the district court for a determination of legal and physical custody, parenting time, and child support based upon the children's best interests.

## CONCLUSION

Those portions of the district court's August 21, 2023, decree conditioning parenting time and child support based upon the distance between the parties' homes are vacated; the remainder of the decree is affirmed. The matter is remanded to the district court with directions to amend the decree related to child custody, parenting time, and child support based upon the best interests of the children.

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED WITH DIRECTIONS.