IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

SOMMER V. SOMMER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SEAN D. SOMMER, APPELLEE,

V.

JENNIFER D. SOMMER, APPELLANT.

Filed October 27, 2020.    No. A-19-1141.

Appeal from the District Court for Douglas County: JAMES M. MASTELLER, Judge. Affirmed.

Ryan M. Hoffman, of Anderson, Bressman, Hoffman & Jacobs, P.C., L.L.O., for appellant.

Stephanie Weber Milone, of Milone Law Office, for appellee.

MOORE, BISHOP, and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Jennifer D. Sommer appeals from an order entered by the district court for Douglas County, modifying a decree of dissolution by awarding physical custody of the parties' two children to Sean D. Sommer, awarding Jennifer parenting time, and ordering her to pay child support. For the following reasons, we affirm.

## II. BACKGROUND

Sean and Jennifer were married in March 1997 and four children were born to the marriage. The parties' two daughters are now adults and are not part of this appeal; the two minor sons are the subject of the current custody dispute. On March 4, 2015, a decree of dissolution (nunc pro tunc) was entered by the district court, dissolving Sean and Jennifer's marriage. According to the partial parenting plan submitted by the parties, they agreed to share legal custody of their four

- 1 -

children but were unable to agree upon physical custody. The decree awarded Sean physical custody of the parties' daughters, who were still minors at the time, and awarded Jennifer custody of the parties' sons, Jacob and Tanner, each subject to parenting time of the other parent. Sean was ordered to pay $487 per month as child support.

On September 10, 2019, Sean filed a complaint to modify the decree, requesting he be awarded custody of Jacob and Tanner. He alleged that substantial and material changes in circumstances had occurred which were not within the contemplation of the parties at the time of the decree, including, but not limited to, the parties' sons' behavior becoming increasingly out of control including difficulties at school that include physical assaults of other students, ability to participate in after school childcare, refusal to follow teachers' instructions, attempts to run away from school, suspension from after school childcare, disruptions in the classroom, vandalism of the school, suspensions from school, threatening other students, hygiene issues, lack of health and dental care, lying, shoplifting, and lack of friends. Jennifer filed an answer denying that a material change in circumstances had occurred, and asserting a counterclaim, seeking modification of child support. Trial was held on September 3. The following evidence was heard at trial.

At the time of the divorce, Jacob was 7 years old, was in second grade at St. Pius/St. Leo Catholic School, and had an Individualized Education Plan (IEP). Sean testified that Jacob was having educational and behavioral issues prior to the divorce due to his learning disability. Jacob was subsequently expelled for behavioral issues. Jacob then attended St. Bernard's school, but was again expelled due to behavioral issues. He then attended an alternative school called Behaven. Jacob later was enrolled at Laura Dodge Elementary, until he was expelled and sent to Saddlebrook Elementary where he attended until he completed elementary school. He now attends Morton Magnet Middle School and is in the seventh grade. According to Jennifer, Jacob is doing "great" at Morton although there are still issues; he is turning in his assignments, he is not talking back to teachers like he used to, and is more focused on doing his homework in class time.

Jennifer testified that Jacob's primary learning disability is emotional disturbance and a secondary speech language impairment. He was also diagnosed with oppositional defiant disorder (ODD) and attention deficit hyperactivity disorder (ADHD). Jacob was prescribed medication for his ADHD and ODD, but because of the side effects, Jennifer testified that she had Jacob stop taking it, and that Jacob is doing better now.

Sean testified that he attended some, but not all, IEP meetings and only attended some parent teacher conferences. Behavior reports from Jacob's third and fourth grade years at Laura Dodge Elementary indicate that Jacob's behavior included 28 reported incidents, including refusing to attend class, refusing to follow directions, interrupting class, drawing on classroom furniture, fighting with other students, threatening students and teachers, and lying to authority figures. Sean testified that he had some difficulty getting information about how Jacob is doing at middle school, although he learned from the school that he had already been tardy five times and absent twice, and that his grades are mediocre. Sean compiled a timeline of incidents noting Jacob's recent issues, including an incident when Jacob brought a stink bomb to school.

Jennifer testified that Tanner was born with a condition called XYY, which affects him behaviorally causing aggression and anger issues. At the time of the divorce, Tanner was 5 years old and in prekindergarten. Sean testified that Tanner's enrollment in prekindergarten at the time was due to developmental delays. Tanner attends Laura Dodge Elementary and is currently in the

fourth grade. He also has an IEP. Tanner's IEP contained behavioral reports from first grade showing that he had issues not following directions, name calling, threatening other students, and climbing on classroom furniture. Sean testified that Tanner's behavioral issues have worsened from being disruptive and not listening to assaulting other children, being disrespectful, throwing objects at teachers, running away from class, attempting to destroy property, and having to be removed by security. The timeline compiled by Sean notes several additional incidents when Tanner was disruptive by leaving class and physically injuring other students by hitting, kicking, and throwing rocks. Sean testified that he has difficulty getting information from Jennifer regarding the boys and she does not discuss their behavior difficulties or health issues with him.

Cody Hays, the principal at Laura Dodge Elementary, testified that Jacob struggled educationally and had behavioral issues. Jacob's behavior was disruptive to his class and he was frequently out of class. Because of behavioral issues, Hays testified that Jacob was suspended a total of three times during fourth and fifth grade years for physical behaviors that impacted the safety of other students and staff. Jacob was ultimately expelled from the school as they could not meet his social-emotional needs. Hays testified that Tanner has struggled both educationally and behaviorally at school, and has difficulty complying with directions, which keeps him out of class. Hays also testified that Tanner had been suspended from school a total of eight times during his second and third grade years for repeated behavioral violations that included aggression toward other students. Tanner missed a week of school at the beginning of third grade as Jennifer was attempting to get him enrolled in a different school, which was unsuccessful. Hays agreed that Tanner had a learning disability. Hays indicated that there are other children with learning disabilities at the school that don't have the type of aggressive behavior such as Tanner exhibits.

Hays contacted the parents on many occasions regarding the boys' behavior. According to Hays, Jennifer would be quite frustrated with their behavior and the responses with their behaviors. When Jennifer talked to the boys over the phone in an effort to get their behavior under control, that effort was unsuccessful "a lot of time." When Hays contacted Sean, he was supportive and tried to work with the boys. Hays observed Sean talking to the boys over the phone in an effort to get their behavior under control, and Hays indicated that "there was a turnaround, a significant turnaround in behavior."

The school recommended counseling for Tanner, and Jennifer independently set up counseling for the boys, which Sean has not attended. However, at the time of trial, counseling for the boys was "on hold" because their therapist was on maternity leave.

Since the divorce, Sean has remarried and now lives in Plattsmouth with his wife and her son. Sean is employed as a road patrol sergeant at the Cass County Sheriff's Department, the same place he was employed at the time of the decree. Sean's work schedule rotates; one week he will work 5 days, and the next week he will work 2 days. His work hours are from 2 p.m. to 2 a.m. Sean also works part time at Walmart 1 day a week to supplement his income to help with his child support obligation. Sean's wife is employed at a data analytics company, and primarily works from home. Sean's wife provides health insurance for Jacob and Tanner through her employment.

Sean testified that he had concerns with Jennifer's care of the boys, including their educational, hygiene, and medical needs. He also has concerns with the boys' respect issues, and lack of life skills. According to Sean, Jennifer failed to take the children to the dentist, and when Sean took Tanner for an exam, he had enormous cavities which required four root canals. Jennifer

stated that she did not take Tanner for regular doctor visits unless he is sick, because he had behavioral problems at doctor visits. Sean also testified that there were several times when the boys would arrive at his house with dirt on them and in unwashed clothes. Sean was concerned with the boys' life skills and indicated that Tanner at nearly 10 years old still did not know how to tie his shoes. Sean's wife testified that they had to create rules for Jacob and Tanner, which included things like shutting the bathroom door while using the bathroom, flushing the toilet, washing their hands, and cleaning up after a meal, which she believed were basic expectations for boys their age. Sean testified that when the boys are with him, they attend nonprofit events and participate in community events such as parades and fundraisers. Jennifer also acknowledged that the boys have friends in Sean's neighborhood, but do not have friends in her neighborhood.

Sean testified that if he were to be awarded custody, he would enroll the boys in parochial school in Plattsmouth, take the boys to church, attend events in the community, and teach the boys to be good citizens. Both Sean and his wife testified that they discipline the boys through time outs, lost privileges, and reminders of the house rules, which normally resulted in good behavior with a few exceptions where Jacob has lied or been disrespectful. Jennifer opposed the boys attending Catholic school in Plattsmouth. Sean testified that his main concern was gaining custody in order to get his children under control. Sean indicated he did not want any child support from Jennifer; rather, he would like to see her "get her life together."

The parties' daughter, Amanda, age 20 at the time of trial, testified that the boys have issues with not listening at both Sean's and Jennifer's houses, and that both parents essentially respond by raising their voice and giving them "a look" which generally corrects the behavior. According to Amanda, the boys "immediately" correct their behavior in response to Sean's discipline.

Under the decree, Sean was awarded an overnight weekday visitation and 2 weeks of summer visitation with Jacob and Tanner. At the time of trial, Sean was not exercising his overnight weekly visitation and had only exercised a full week of summer vacation in 1 year since the decree. Sean testified that he does exercise his parenting time every other weekend. Sean did exercise the midweek visitation after the decree was entered when he lived in an apartment near Jacob's school, but since moving to Plattsmouth, he felt it was unfair to require them to drive an hour each direction when they would only have a few waking hours to spend together.

Jennifer has continued to reside in the former marital residence in Omaha since the divorce. Tiffany and Amanda, the parties' two adult daughters, live with Jennifer, as well as Jacob, Tanner, and Tiffany's fiance and son. Since the entry of the decree, Jennifer filed for bankruptcy twice. There was also a period of time where Jennifer's home loan on the marital residence was in arrears, and a foreclosure was started. Jennifer completed a loan modification in the month prior to trial and therefore avoided foreclosure.

Jennifer testified that since the decree was entered, she has held approximately five or six jobs, but currently works for a security company and provides security at a meatpacking plant. Jennifer works from 6 a.m. to 2 p.m. Monday through Friday and occasionally works Saturdays. A copy of one of Jennifer's recent paystubs showed that Jennifer earned $10 per hour, working 80 hours in a 2-week pay period. Because of Jennifer's hours, Amanda is responsible for taking Jacob and Tanner to school.

Jacob testified very briefly. He was 12 years old and had just started seventh grade at the time of his testimony. Jacob said that things were going "good" at school, although he had recently

been in trouble for bringing a stink bomb to school. Jacob described the activities that he does at both parent's houses as well as what happens at each house when he gets in trouble, which includes having privileges taken away and the use of time out. When asked by the judge whether he understood why he was testifying, Jacob indicated that he didn't know why he was there. When asked by the judge whether he had anything he wanted to say, Jacob testified that Jennifer's house is quiet at night, but that sometimes Sean's wife yells at night at Sean's house.

Upon examination by Jennifer's attorney, Jacob indicated that he likes staying at both Jennifer and Sean's houses. Jacob also testified that he would like to spend more time with his dad. When asked what he would think about changing schools, Jacob stated "that would kind of make me upset" because "I'd lose all my friends."

The district court entered an order modifying custody, awarding Sean sole physical custody and awarding Jennifer parenting time on alternating weekends and one weeknight. Jennifer was ordered to pay child support of $217 per month for two children, and $55 per month for one child. Jennifer appeals.

## III. ASSIGNMENTS OF ERROR

Jennifer assigns that the district court abused its discretion by modifying its prior order to award Sean sole physical custody, limiting her parenting time, and ordering her to pay child support.

## IV. STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Whilde v. Whilde*, 298 Neb. 473, 904 N.W.2d 695 (2017). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *State on behalf of Ryley G. v. Ryan G.*, 306 Neb. 63, 943 N.W.2d 709 (2020).

When evidence is in conflict the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019).

## V. ANALYSIS

### 1. MODIFICATION OF CUSTODY

Jennifer assigns that the trial court abused its discretion in modifying the decree by awarding Sean sole physical custody of their two minor children. Jennifer argues that Sean did not demonstrate a material change of circumstances, the district court failed to give proper weight to Jacob's opinion regarding where he wanted to reside, Sean failed to exercise his parenting time, and that even if Sean proved a material change in circumstances, he failed to show that modification was in the minor children's best interests. Jennifer also argues that it was error to allow a "nonparent to parent the minor children."

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing either that the custodial parent is unfit or that the best interests of the child require such action. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). This showing has been described as a two-step process: First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. *Id*. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Id*.

A material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Id*. The Nebraska Supreme Court has also explained that if a change in custody is to be made, it should appear to the court that the material change in circumstances is more or less permanent or continuous and not merely transitory or temporary. *Id*.

In its order in this case, the district court found:

[T]here have occurred substantial and material changes in circumstances not within the contemplation of the parties at the time which, in the best interest of the parties' minor children, warrant modification of that decree including, but not limited to, the parties' sons' behavior becoming increasingly out of control including difficulties at school that include physical assaults of other students, ability to participate in after school child care, refusal to follow teachers instructions, attempts to run away from school, suspension from after school child care, disruptions in the classroom, vandalism of the school, suspensions from school, threatening other students, school tardiness, missing school, hygiene issues, and lack of health and dental care.

Jennifer first argues that the court abused its discretion in finding that a material change in circumstances occurred. Jennifer asserts that the children suffered from disabilities that cause their behavioral issues, which issues existed at the time the decree was entered. Jennifer further argues that although Jacob had behavior issues in elementary school, he is doing better in middle school. And, she argues that Tanner's behavior has not changed since the initial decree. In response, Sean asserts that Jennifer failed to provide proper parental care and discipline for the boys, therefore causing their worsening behavioral issues. Sean points to the evidence that there was an increase in behavioral issues while the boys remained in Jennifer's custody. Sean also points to the evidence about Jennifer's failure to obtain proper dental care for the boys.

In our review of the record, and giving deference to the trial judge who heard and observed the witnesses, we cannot say that the district court abused its discretion in finding that there was a material change in circumstances since the entry of the decree, particularly as it relates to the boy's increasing behavioral problems at school.

(b) Jacob's Preference

Jennifer next argues that the district court abused its discretion in failing to properly consider Jacob's opinion as to where he wanted to reside. Nebraska law explicitly provides that a court shall consider "[t]he desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning."

*Leners v. Leners*, 302 Neb. 904, 925 N.W.2d 704 (2019). While the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration. *Id.*

The district court did not specifically mention Jacob's testimony in its written order. However, in our de novo review of the record, we note that Jacob was not asked, nor did he state, where he preferred to live. Jacob did respond that he would be "kind of" upset to change schools. Given the number of schools that Jacob has attended during his elementary years, his position is certainly understandable. However, Jacob also expressed a desire to spend more time with his father and that he liked living in both parents' houses. Based on our review of Jacob's testimony, and considering his age of 12 years, we do not find an expressed preference to guide us in this custody determination. We cannot say that the district court abused its discretion in failing to give weight to Jacob's testimony.

(c) Failure to Exercise Parenting Time

Jennifer argues that Sean should not be awarded custody because he has not exercised the full amount of parenting time allotted to him. Jennifer cites to cases in which a parent has failed to exercise visitation on numerous occasions or had no contact with the children for several months as the basis for denying an award of custody. See, *Hoins v. Hoins*, 7 Neb. App. 564, 584 N.W.2d 480 (1998) (finding no material change in circumstances relating to mother's lifestyle; noting father also had female guests overnight and failed to exercise visitation rights on several occasions); *Boamah-Wiafe v. Rashleigh*, 9 Neb. App. 503, 614 N.W.2d 778 (2000) (affirmed denial of father's request to change custody for failure to show material change in circumstances; noting father had virtually no contact with children for 13 months prior to trial). We find those cases to be distinguishable. While Sean did not always exercise his midweek overnight parenting time or all of his summer parenting time, he routinely exercised his weekend parenting time every other week. And, as we determined above, Sean met his burden of proving a material change in circumstances, unlike the cases noted above.

Jennifer further argues that Sean did not attend all of the IEP meetings, doctor appointments, and activities of the children. Sean, on the other hand, presented evidence of his attending to the childrens' dental needs, his attendance at some of the IEP meetings, his communication with the children's schools, and his difficulty in obtaining information about the children from Jennifer. We find no abuse of discretion in the court's failure to penalize Sean for not exercising the full amount of parenting time given his work schedule and the boys' activities.

(d) Best Interests

Jennifer argues that Sean failed to prove that modification of custody was in the children's best interests.

When determining the best interests of the child in the context of custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *Jones, supra.* Other relevant considerations

include stability in the child's routine, minimization of contact and conflict between the parents, and the general nature and health of the individual child. *Id*. No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case. *Id.* The one constant is that the child's best interests are always the standard by which any custody or parenting time determination is made. *Id*.

Here, the record shows that Sean and Jennifer both have a positive relationship with the boys. Jacob testified that he liked staying with both Sean and Jennifer. Further, as discussed above, there is no evidence as to the desires of the children, other than Jacob testifying that he might be upset if he had to change schools. Further there is no evidence of abuse or neglect in either home. Thus, we turn to the general health, welfare, and social behavior needs of the boys.

As we have discussed above, the general health, welfare, and social behavior of the boys would be better served with Sean as the custodial parent. Although both boys do have various disorders leading to behavioral problems, there is at least some evidence that the boys are more responsive to Sean's discipline. Further, Sean has demonstrated that he has attended to the dental needs of the children when Jennifer failed to do so. Although Sean works overnight approximately 14 days out of the month, he is able to be home for the boys during the mornings on his work days, he will work his weekend shifts when the children are with Jennifer, and his wife is able to work from home to provide care when Sean is at work.

Thus, the factors regarding the boys' best interests weigh in favor of Sean. Sean demonstrated that he is in the better position to handle the boys' behavioral needs and provide a stable environment. Therefore, we find that the district court did not abuse its discretion in finding that it is in the children's best interests to award Sean physical custody.

### (e) Allowing Nonparent to Parent Minor Children

Jennifer argues that the district court abused its discretion in allowing Sean's wife to parent the children a majority of the time. Jennifer cites to the parental preference doctrine to assert that her right to custody trumps any interest Sean's wife has to the parent-child relationship. See, *Farnsworth v. Farnsworth*, 276 Neb. 653, 756 N.W.2d 522 (2008). That doctrine has no application here since custody of the children was not awarded to Sean's wife. Jennifer's argument seems to be that if Sean is awarded custody, the children will be in his wife's care more than his. However, the record shows that Sean's work schedule will allow him to spend significant time with the children, and that he will work his weekend shifts when the children are with Jennifer for her parenting time. Sean testified that his wife would only be responsible for caring for the boys on the two weeknights he works, totaling eight nights per month. The assistance of a stepparent in caring for minor children is certainly not unusual. We reject this argument.

### 2. CHILD SUPPORT

Jennifer also argues that the district court abused its discretion in awarding Sean child support. She points to Sean's testimony at trial that he would agree to a downward deviation from the Nebraska Child Support Guidelines, such that Jennifer not be required to pay child support.

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). However, a court may deviate from the guidelines if its application in an individual case would be unjust or inappropriate. *Id*.

Deviations from the guidelines must also take into consideration the best interests of the child or children. *Id*.

Here, the district court determined that Jennifer had an earning capacity of $13.00 per hour, since she voluntarily left employment where she was earning that wage. The court then imputed Jennifer's gross monthly income, based upon 40 hours per week, at $2,253.33. Using Sean's gross monthly income at the time of trial of $5,763.47, the child support calculation resulted in Jennifer's share for two children at $517 per month. However, the court went on to find, that at the suggestion of Sean and for the benefit of Jennifer, a downward deviation from the guidelines was warranted, and in the minor children's best interests, because the parties shall split equally all expenses incurred in behalf of the minor children. The court then set Jennifer's child support obligation for two children at $217 and for one child at $55. Thus, Jennifer received a substantial reduction in her child support obligation as a result of the court's deviation from the guidelines. The main principle behind the child support guidelines is to recognize the equal duty of both parents to contribute to the support of their children in proportion to their respective net incomes. See Neb. Ct. R. § 4-201. We can find no abuse of discretion in the district court's award of child support from Jennifer to Sean.

### 3. Limiting Parenting Time

Jennifer assigned that the district court erred in limiting her parenting time. However, Jennifer did not argue this assigned error in her brief. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Fetherkile v. Fetherkile,* 299 Neb. 76, 907 N.W.2d 275 (2018). Therefore, we need not address whether the district court erred in limiting Jennifer's parenting time.

### VI. CONCLUSION

In conclusion, the district court did not abuse its discretion in awarding Sean physical custody of the boys, in determining Jennifer's parenting time, or in awarding Sean child support.

AFFIRMED.