IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

GRIEPENSTROH V. PROCTOR

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ANDREW GRIEPENSTROH, APPELLEE,

V.

ANGELA PROCTOR, FORMERLY KNOWN AS ANGELA CLARK, APPELLANT.

Filed November 2, 2021.    No. A-20-738.

Appeal from the District Court for Otoe County: JULIE D. SMITH, Judge. Affirmed.

Adam R. Little, of Ballew Hazen, P.C., L.L.O., for appellant.

W. Gregory Lake, of Nebraska Legal Group, for appellee.

PIRTLE, Chief Judge, and MOORE and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Angela Proctor appeals from the order of the district court for Otoe County, which found her in contempt and imposed sanctions against her, and which modified the court's previous orders regarding custody, parenting time, and child support. Finding no abuse of discretion, we affirm.

## II. STATEMENT OF FACTS

### 1. PATERNITY ORDER

Andrew Griepenstroh and Angela are the parents of a minor son, Drew, born in 2008. In 2011, an order was entered establishing paternity, custody, and parenting time. In 2015, an order was entered modifying the paternity decree. The 2015 order and parenting plan provided that Angela would have legal and physical custody, and it also provided that the parents would consult with each other regarding major decisions affecting Drew's development or well-being; were to make mutual medical and dental decisions for Drew, except under emergency circumstances; and

- 1 -

would keep one another informed regard to his educational progress. The parenting plan provided that Andrew would have parenting time the first three weekends of each month from 6:30 p.m. Friday to 6 p.m. Sunday and summer parenting time every other week during June and July and the first week in August; it also specified a holiday parenting time schedule. The 2015 order required Andrew to pay $500 per month in child support and cash medical support of $126 per month (because health insurance was not available at a reasonable cost and/or not accessible at that time).

## 2. COMPLAINT FOR MODIFICATION

On June 3, 2019, Andrew filed a complaint for modification, seeking sole legal and physical custody of Drew, or in the alternative, joint physical and sole legal custody, as well as the determination of a parenting plan, child support and division of childcare, extracurricular activities, and unreimbursed medical expenses, and attorney fees. Andrew alleged that since the entry of the previous order, the following material circumstances had occurred: Angela had not allowed the ordered parenting time, Drew had missed an excessive amount of school, Angela would not allow Drew to participate in extracurricular activities, Angela did not communicate with Andrew regarding Drew's medical or dental visits, and Angela was taking Drew to the doctor excessively. Andrew alleged that Drew's best interests required a change in the order regarding custody, support, and parenting time.

## 3. ANDREW'S CONTEMPT ACTION AND OTHER PLEADINGS

On July 23, 2019, Andrew filed a motion for order to show cause, alleging that Angela should be found in willful contempt of the 2015 order for failing to communicate with him and involve him regarding Drew's medical treatment, for failing to inform Andrew regarding Drew's school attendance, for failing to adhere to the parenting time provisions, and in failing to cooperate in telephone contact between Andrew and Drew.

On July 26, 2019, Angela filed an answer to Andrew's complaint and a counter-complaint for modification, in which she alleged that a material change in circumstances had occurred, that Andrew's parenting time should be suspended "due to [Andrew's] parenting abilities and the psychological/emotional needs of [Drew]," and that a mutually agreeable parenting plan as provided in the Parenting Act had not been developed. Angela also sought a modification of child support and contribution toward child related expenses, and attorney fees. Andrew, in his reply, denied the allegations of the counter-complaint.

At an October 8, 2019, hearing scheduled on Andrew's motion for contempt, Angela sought a continuance due to the unavailability of one of her witnesses (there had been a suggestion prior to the hearing that the witness might be in violation of Neb. Rev. Stat. § 28-711 (Reissue 2016) (obligation to report child abuse or neglect)). The district court found good cause to continue the hearing over Andrew's objection, and the show cause hearing was continued to October 21. The court also addressed a motion filed by Angela with respect to parenting time. The court ordered specific parenting time for Andrew "each Wednesday" from 5 p.m. to 8 p.m. and on Sunday, October 13, and Sunday, October 20, with the Sunday visits occurring from 8 a.m. to 5 p.m. These visits were to be supervised by Andrew's mother. The court also granted a request by Angela for a parenting evaluation.

The district court heard Andrew's contempt motion on October 21 and 22, 2019. The court received various exhibits offered by the parties, including copies of text messages exchanged by the parties, attorney fee affidavits, school attendance reports for Drew, and a written statement from Drew's therapist. The court heard testimony from the parties, Andrew's mother and his girlfriend, and Drew's therapist. The court also heard in camera testimony from Drew. Drew's testimony has been sealed, and while we have reviewed and considered his testimony in our de novo review of the record, we will not recount it here. At the close of Andrew's evidence, Angela made a motion for directed verdict, and the court granted her motion with respect to the allegations about her failure to communicate about school absences and medical issues, holiday parenting time, and telephone calls with Drew. The court found that Andrew had presented enough evidence with regard to the denial of his parenting time to avoid Angela's motion for directed verdict. Accordingly, we have only summarized below the evidence with respect to that issue.

Andrew lives about five houses away from Angela and her husband. Andrew stopped receiving his regular weekend parenting time with Drew in April 2019. He also confirmed that he did not receive his holiday or summer parenting time and that Drew had not gone on a Colorado family vacation trip with Andrew, a trip which Drew had gone on in previous years. Andrew did not know of anything particular that prompted the cessation of his parenting time, although he referenced allowing Drew to miss parenting time on a few occasions to spend time with his half-brothers and cousins, which then "turned into a lot more times," despite Andrew's efforts to "get him to come over." He also testified about an instance in March when he and his girlfriend went bowling with Drew, which was the first time Drew met the girlfriend, but according to Andrew, they all had fun. Text messages between the parties reflect that Angela informed Andrew that she was not sending Drew on the Colorado trip with Andrew based on how "it has affected [Drew] mentally" and the fact that Drew "wouldn't eat and was not sleeping due to the anxiety of it."

Andrew testified about his four supervised visits with Drew in the 2 previous weeks, describing them as "great" and later as having "been fine." Andrew testified that the night before his testimony, he had been visited by law enforcement and accused of child abuse (based on a bruise on Drew's arm and Drew's statement that Andrew hit him). Andrew denied hitting Drew. Andrew offered as an exhibit Drew's attendance records he received from Drew's school, documenting that Drew had 48.875 absences during the 2018-2019 school year. Reasons for the absences documented on the exhibit include "not feeling well," "fever," "diarrhea," "flu," "stomach ache," "appendix?," "vomiting [sic]," "migraine," "concussion," "headache," leaving for various doctor appointments, "refusing to come to school," and "absent per mom." When asked about his awareness of Drew's medical conditions, Andrew testified, "I guess he has ADHD and [is] allergic to everything and trees and cats and whatever else." Andrew did not know the names of Drew's medications, but he agreed that Drew takes "an ADHD medication" and "some sort of sleeping medication." He also testified that Drew had seen various therapists, some of whom Andrew had met. When asked about the anticipated testimony of Drew's current therapist, Andrew again denied ever abusing Drew, stating, "I've never even spanked him."

In their testimony, Andrew's mother and his girlfriend both denied ever seeing Andrew physically abuse Drew. Andrew's mother confirmed that she and her family have almost always taken a summer vacation and that Drew had always gone with them prior to 2019.

Before her testimony, the district court advised Drew's therapist, Jenina Lepard, of her right not to testify. Lepard began seeing Drew near the end of July 2019, after Angela contacted her and expressed concerns about Drew having anxiety and anger issues. Lepard had been seeing Drew weekly since July 23. She testified that Angela had been present during all of her sessions with Drew at Drew's request. Lepard testified to her belief that Drew suffered from those issues (anxiety and anger), indicating Drew had repeatedly expressed having anxiety upon seeing Andrew. She felt medication was necessary to help treat Drew's issues, and she testified that his medication was not just for his anxiety, but also for "migraines, immune deficiency, ADHD, allergies." She testified that Drew reported to her that Andrew had struck him or been otherwise physically abusive on multiple occasions and that this was a frequent topic during her sessions with Drew. According to Lepard, it would be beneficial for Drew to see Andrew in a therapeutic environment. She noted that concerns had been raised to her about Drew not eating, not sleeping well, and having migraines. Lepard testified that many of those issues were tied to Drew's anxiety and directly related to Andrew's "behavior." She believes Drew will continue to suffer these symptoms if alone with Andrew for an extended period.

According to Lepard, Drew reported physical abuse to her during their first session on July 23, 2019, but she did not report that abuse until about 2 weeks prior to her testimony during the October 21 hearing (after the continuance on October 8). She stated that she did not make a report on July 23 because the abuse reported at that time "was in the past." Lepard testified that she made a report to Child Protective Services the morning of her testimony because of Drew's reports of "extreme anxiety during and after" the recent visits with Andrew and his concern that he would be abused. She testified that "[her] training prepare[d] [her] to detect lies" and that she was "pretty good at it."

Angela testified that Drew has been diagnosed with asthma, allergies, ADHD, depression, separation anxiety, and a sleeping disorder. She indicated that the parties successfully coparented Drew prior to when the present case was filed. According to Angela, Andrew would sometimes allow Drew to decide whether he wanted to attend his parenting time. She also testified that Andrew would occasionally not show up for his parenting time, which affected Drew negatively. Angela testified that Drew's behavior started changing in September 2018. Between September 2018 and March 2019, Drew would sometimes call her during visits; would be upset, crying, and ask her to pick him up; and that Andrew "had no problem" with her doing so. Angela encouraged Drew to spend time with Andrew and attend scheduled parenting time, but she witnessed more behavioral problems from him in March or April 2019. She described his behavior when "very anxious," stating that he would cry, he would sometimes scream "don't send me," and it was "like he was climbing the wall." She also indicated that he would not eat or sleep, would "withdraw," and that his anxiety was affecting his school performance. Angela testified that Andrew's summer vacation time (for the Colorado trip) caused Drew so much anxiety that she made "an emergency medical decision" to keep him at home. Angela admitted that she had accused the father of Drew's half-brothers of mentally and physically abusing their children and that she did not have custody of those children.

On October 25, 2019, the district court entered an order, finding by clear and convincing evidence that Angela was in willful contempt of the parenting plan by failing to provide Andrew with his regular weekend parenting time and summer parenting time between April and July 23.

In its order, the court made detailed findings about both Lepard's and Drew's testimony. The court found that Lepard's testimony was not credible for numerous reasons, including her conduct and demeanor while testifying and inconsistencies in her testimony about what Drew disclosed and when he made those disclosures. The court also expressed its concerns with Drew's testimony, including:

> [I]nstance(s) in which it was clear that Drew was not using his own words, using words he could not pronounce or words of which [he] did not know the meaning; instance(s) in which what Drew said occurred which simply could not have occurred without causing results which did not materialize; and instance(s) in which Drew paused for a lengthy amount of time before answering, indicating to the court that perhaps he wanted to give a different answer but thought he shouldn't. However, even if the court were to take all of Drew's testimony as true, [Angela] would still be in willful contempt of the court's [November 2015 order] for failure to require Drew to go to his father's house for his regular weekend parenting time between April 2019 and July 23 . . . as well as the family trip to Colorado between July 14 . . . and July 21. . . .

(Emphasis in original.) The court went on to note that while there was testimony that Drew experiences anxiety and did not want to attend parenting time with Andrew, Drew did not make any allegations of abuse to Angela, Lepard, or anyone else prior to July 23. The court noted Angela's testimony that between April and July 23, although she and her husband encouraged Drew to attend parenting time with Andrew, she left it up to Drew, who was then 10 years old, whether to do so. The court stated, "[Angela] has a duty not only to encourage a ten-year-old to go to his father's parenting time; she has a duty to require it." The court also stated, "[s]urely that was possible," given that Angela had required Drew to attend parenting time with Andrew four separate times between October 8 and 21. The court found the fact that Andrew had voluntarily relinquished some of his parenting time in the past to allow Drew to spend time with his half-brothers was not a defense. Although the court found Angela in contempt of the parenting time provisions of the parenting plan, due to Drew's "recent allegations of abuse by [Andrew]," the court did not impose a sanction against Angela at that time. Rather, the court ordered that the sanction hearing be held at the time of trial for the modification action.

On December 12, 2019, the district court entered a temporary order, addressing a motion for temporary allowances filed by Andrew and a motion to suspend parenting time filed by Angela. The court noted evidence that Andrew had been receiving his regular parenting time since entry of the contempt finding against Angela and that Andrew had installed cameras in his home in response to the allegations of child abuse. Next, the court noted an incident in November when police showed up at a hotel where Andrew and Drew were staying after Drew spent some time on the telephone while in the bathroom. The officers assessed the situation and made no arrest; Angela eventually picked Drew up from the hotel. Finally, the court noted evidence that Drew had snuck out of Andrew's residence and returned to Angela's on other occasions during Andrew's parenting time and that law enforcement and the Department of Health and Human Services investigated an accusation of child abuse in October and found that no abuse had occurred and the allegation was "unfounded." The court again noted its concerns about the credibility of the testimony provided by Lepard and Drew at the time of the earlier contempt hearing. While the court found there was

no credible evidence that Andrew had been physically abusing Drew, it did find that Drew was "extremely distraught" and his behavior at both parental residences and at school had deteriorated. The court stated, "There has been too much flexibility in the parenting schedule, giving Drew the impression that parenting him is up to him and creating stressors in Drew's life," and it noted the communication problems between the parties and Drew. The court stated that the parties need to require Drew to spend his parenting time with each party instead of leaving at will and going to the house of his choice. The court denied Angela's request to suspend parenting time and also denied Andrew's request to award him sole physical and legal custody on a temporary basis. The court ordered the parties to comply with the previous parenting plan subject to a temporary modification regarding telephone contact. The court required both parties to provide 5 days' written notice before not exercising parenting time, forbade both parties from posing questions to Drew which implied parenting time was up to him, and ordered the parties to communicate in a meaningful way to coparent Drew.

4. ANGELA'S CONTEMPT ACTION, OTHER MOTIONS, AND MODIFICATION TRIAL

On February 7, 2020, Angela filed a motion for order to show cause, alleging that Andrew should be held in contempt for alleged violations of the 2015 parenting plan and the December 19, 2019, temporary order. Specifically, Angela alleged that Andrew disparaged Angela in Drew's presence, failed to exercise certain parenting time as provided in the temporary order and did not provide the required notice, left his parenting time decisions up to Drew, and repeatedly failed to meaningfully communicate with Angela about issues necessary for coparenting.

At a hearing on February 14, 2020, the district court considered various motions filed by the parties. Although Andrew had not been served in the contempt action filed by Angela, he entered a denial, and the court advised him of his rights. The court scheduled final hearing on Angela's contempt action for the same time as the modification trial. The court also heard a motion for sanctions filed by Andrew in his contempt action against Angela and Angela's motion to dismiss that motion.

In support of her motion to dismiss Andrew's motion for sanctions, Angela offered an affidavit, in which she stated, among other things, that Andrew disparaged her in Drew's presence when she dropped Drew off for visitation on December 20, 2019; that she received a phone call later that night indicating Drew had threatened to attempt suicide, after which he was taken to the hospital for evaluation and returned to Angela's residence for the night, as recommended by the doctor; and that Andrew then failed to exercise parenting time on additional dates in December 2019 and January 2020. Angela attached text message correspondence of the parties between December 19, 2019, and February 6, 2020, in support of her allegations. Among the things documented in the text messages was the parties' discussion of how to handle the fact that Drew had been returning to Angela's residence during his parenting time with Andrew. The parties' discussion reflects the lack of clarity at that point for whose responsibility it was to return and/or pick up Drew in the event he ran away from Andrew's home.

In discussing Andrew's motion for sanctions, the district court expressed concern about Drew's threat to harm himself, noted that it had not yet received the previously ordered parenting evaluation, and declined to impose sanctions against Angela at that point. Angela's attorney asked the court to provide clarification of the parties' responsibilities for transportation on occasions

when Drew would run away from Andrew's residence and return to Angela's residence. The attorneys also discussed with the court the parties' efforts to seek further mental health evaluation and treatment for Drew. The court made further rulings based on those discussion that were memorialized in the court's subsequent order.

In its order following the February 2020 hearing, the district court denied Angela's motion to dismiss. It also denied Andrew's motion to impose sanctions against Angela at that time for her willful contempt, stating that it would impose sanctions against her after receiving evidence at the final hearing and after completion of the previously ordered parenting evaluation. The court ordered the parties to comply with all court orders then in effect, "including but not limited to the exercise of parenting time." The court also made several specific orders relating to Drew. First, the court stated:

> If Drew runs away from [Andrew's] house during parenting time, it is the responsibility of [Angela] to take Drew back to [Andrew's] house immediately. If [Angela] is more than 25 miles from Syracuse, Nebraska, at the time, [Andrew] shall retrieve Drew from [Angela's] home. For this purpose, if [Angela] does not authorize [Andrew] to enter her home (with or without the assistance of law enforcement) while she is not home, [Angela] will be required to return to Syracuse, Nebraska, immediately, regardless of her location to return Drew to [Andrew's] home.

The court also ordered as follows:

> The parties are ordered to take Drew to a psychiatrist. In doing so, the parties are to make a mutual decision as to the provider and the course of treatment for mental health. If the parties are unable to agree upon a psychiatrist, [Andrew] has the final authority. Any expenses relating to the cost of the psychiatrist which are not reimbursed by or covered by insurance shall be shared equally between the parties.

Trial was held on June 26 and 29, 2020, on the parties' respective complaints for modification, Angela's motion for order to show cause, and for disposition regarding the previous finding that Angela was in willful contempt. The court received various documentary exhibits and heard testimony from witnesses including the parties, a friend of Andrew's, the psychologist who conducted the parenting evaluation, and Andrew's girlfriend. Much of the trial evidence was duplicative of and consistent with evidence received at other hearings and noted above. We have summarized relevant additional evidence below.

Andrew's long-time friend helped Andrew install video cameras in his residence because of the abuse allegations against Andrew. No recordings from these cameras were admitted into evidence. Andrew testified that he had deleted any recordings from the cameras, but he denied that there had been anything on them to support the allegations of abuse. Andrew's friend testified that he had never seen Andrew abuse Drew. The friend had observed Andrew drinking alcohol in the past, including in Drew's presence, but he testified that he had never seen Andrew drink excessively. The friend felt Andrew was a good father and someone he would trust to watch his own children.

Dr. Rick McNeese testified about his parenting evaluation of the parties. McNeese conducted clinical interviews of the parties and Drew, had structured behavioral observation of

Drew with each party, administered various psychological testing instruments to the parties, and reviewed collateral information (including court records and information from Drew's current therapist). McNeese did not conduct home visits due to precautions relating to the COVID-19 pandemic, but the parties agreed to provide him with pictures of their respective residences. McNeese felt that Drew's ADHD was not being fully treated and that a different medication would be helpful. McNeese stressed the importance of the parties working together on a consistent treatment plan for Drew. Based on information from Drew's current therapist, McNeese felt that the relationship between Andrew and Drew had already improved. And, he testified that it would be important for both parties to each work on improving their individual parenting skills.

In addition to testifying about his parenting evaluation, McNeese also testified about how information might be relayed by children who have been "coached." McNeese testified about the statement in his report that when a child has "ADHD with inattentive type," like Drew, it would be more difficult for a parent to coach the child to tell a particular story, and that due to issues in the child's short-term memory, his recitation would be more likely to present in a halting or confused manner. In his testimony, McNeese indicated that children who have been "coached" usually "will have a pretty superficial kind of explanation with few details."

In his report, McNeese provided detailed comments and recommendations, which we do not recount further here, except to note that McNeese felt that the parties needed to work together in parenting Drew and would benefit from joint counseling sessions with respect to their parenting of him, that Drew would benefit from a change in medication and a thorough psychological and behavioral evaluation, that stability and consistency were important for Drew, as well as gradual changes in parental contact, and that if Andrew was unable to abstain from alcohol during Drew's visits, he should undergo a substance abuse evaluation. McNeese also observed that Andrew "has a difficult time parenting Drew," and he cautioned against any "verbal abuse" or "rants" by Andrew. McNeese observed that without the changes recommended in his report, approaches to managing Drew's resistance to contact with Andrew would be less likely to succeed.

The parties and Andrew's girlfriend testified about the issue of Drew running away from Andrew's house during his parenting time. The evidence shows that he did this on more than one occasion following entry of the December 2019 temporary order and continued to do so on occasion after entry of the February 2020 order. Prior to the February order, the parties would exchange text messages to address the issue, but as noted above, there was some confusion as to whose responsibility it was at that point to return Drew to Andrew's residence. On one occasion after the February order, Angela informed Drew that she would not be home if he ran away. Angela agreed that there was a weekend when Drew did not run away, but it is unclear whether this corresponds with the occasion when she texted him that she would be out of town. The evidence reflects that the summer parenting time schedule was going well and Drew had not run away recently.

Additional text messages between the parties were admitted into evidence during the modification trial, and it is clear that the parties communicate primarily by text message and have had antagonistic exchanges in the past. However, they both testified they would be able to communicate with one another effectively about parenting issues if legal custody were changed despite their past difficulties.

The parties also testified about the December 2020 incident when Drew threatened self-harm. We do not recite further details here, except to note that Drew revealed at one point that he intended to harm himself by holding his breath. We also note that Drew continued to be in counseling at the time of the modification trial and that he was seeing a different therapist than Lepard. Angela felt that counseling with the new therapist was helpful to Drew, it had improved Drew's relationship with Andrew, and further counseling with this therapist would be beneficial.

At the time of the modification trial, Andrew was employed as a journeyman mason, earning $28.50 per hour. Angela had not been employed outside the home for several years; her last job had been part-time employment. Her last full-time job outside the home was about 4 years prior to trial, at which time she earned minimum wage. She testified that she did not have anything limiting her ability to work, but she indicated that she was not working currently, in part, because of Drew's issues and also because she was providing some care for her grandfather.

5. MODIFICATION DECREE

On August 7, 2020, the district court entered a decree of modification. The court found that there had been a substantial and material change of circumstances warranting modification of the 2015 order. The court made detailed findings with respect to the change of circumstances regarding custody and Drew's best interests. In finding a material change in circumstances, the court noted, among other things, that Angela had not allowed ordered parenting time beginning in April 2019 and continuing until October, that Drew had missed an excessive amount of school, and that both parties had failed to communicate well regarding Drew. The court expressed concern about how often Angela had taken Drew to the doctor "without ever seeing a specialist" and the amount of school Drew had missed for those appointments, but it declined to find that Angela was taking Drew to the doctor excessively, as alleged by Andrew. (Emphasis in original.) With respect to best interests, the court again noted the "false allegations" of abuse that had been made against Andrew. Angela had urged the court to reconsider its previous findings with regard to the credibility of Drew's earlier in camera testimony, but the court again expressed its reservations about certain aspects of Drew's testimony, even in light of possible explanations provided by McNeese. The court also noted Andrew's denial of any physical abuse of Drew, and it found that Angela had not established by a preponderance of the evidence that Andrew had committed child abuse or neglect. In connection with additional best interests findings, while noting McNeese's opinion that "increased contact with [Andrew] should be done gradually, rather than with a large change," the court stated that its order was "maintaining the status quo which has been working well this summer." The court found it was in Drew's best interests "to continue with the every-other-week arrangement so that he may bond with both parents." The court also found that Drew could benefit from the parties' different parenting styles and that neither was an unfit parent. The court determined that the parties should be awarded joint physical and legal custody of Drew subject to the provisions of the parenting plan attached to the decree, which adopted an "alternating week-to-week" regular parenting time schedule with exchanges on Sunday evening at 6 p.m. and also specified holiday and vacation parenting time. The court also ordered, among other things, that the parties undergo joint counseling sessions in order to agree how to best parent Drew and investigate whether Drew's ADHD was being treated appropriately. The court modified Andrew's

child support obligation to $363 per month and terminated his obligation to pay cash medical support.

In connection with its previous finding that Angela was in willful contempt of court, the district court ordered that she serve 15 days in jail beginning on December 10, 2020. The court provided that Angela could purge herself of the jail sentence by forfeiting her Halloween and Thanksgiving parenting time in 2020 and by paying attorney fees of $7,500 by December 1 for Andrew's benefit. The court ordered Angela to pay attorney fees of $7,500 for Andrew even if she opted not to purge herself of the jail sentence. With regard to Angela's contempt action against Andrew, the court determined that Angela had not served Andrew. The court stated that although it appeared Andrew was not complying with the court's order, the court lacked jurisdiction to find him in contempt due to Angela's failure to serve him. Accordingly, the court dismissed Angela's action against Andrew, but it admonished Andrew to comply with the court's orders.

### 6. MOTION FOR NEW TRIAL

Angela filed a motion for new trial and motion to alter or amend. On September 11, 2020, the district court overruled the motion for new trial, and granted the motion to alter or amend in part, finding that it had jurisdiction to address Angela's motion for order to show cause because Andrew had previously entered his appearance and a denial in that action. The court found Andrew in contempt for failing to exercise certain parenting time in January 2020 and in not providing notice to Angela. It found the remaining allegations of contempt against Andrew had not been proven. The court observed that it had found both parents to be in willful contempt of its order, but that Angela's contempt had resulted in Andrew not having parenting time for several months and was more egregious than Andrew's. The court ordered sanctions against Andrew in the total sum of $750 and directed that he could purge himself of contempt by exercising all of his parenting time through November 15, 2020. The court admonished both parties to comply with the court's orders. The court also ordered Andrew to pay the sum of $1,000 toward Angela's attorney fees, which it offset against the fees Angela was ordered to pay, bringing the total she owed for Andrew's attorney fees down to $6,500. The court addressed Angela's argument that its prior order requiring that she pay Andrew's attorney fees within 4 months was excessive, punitive, and an abuse of discretion. The court disagreed, given the fact that Angela's willful contempt had caused Andrew to miss out on several months of parenting time and required him to incur attorney fees. However, given the court's finding of contempt by Andrew and Angela's assertion that she would not be able to pay the ordered amount by December 1, the court amended the sanctions imposed upon Angela by separating out the jail sentence into two installments: 10 days beginning on December 10, 2020, and 5 days beginning on the 10th day of the month following the first missed payment of attorney fees. The purge plan remained the same for the December 10 jail sentence; the 5-day jail sentence could be purged by paying the $6,500 attorney fees in $1,000 installments beginning on December 1, 2020, and on the first of the month thereafter until satisfied. Finally, the court denied Angela's motion as it related to the modification action.

Angela timely appealed.

## III. ASSIGNMENTS OF ERROR

Angela asserts that the district court abused its discretion in (1) finding that she was in willful contempt, (2) imposing punitive and excessive sanctions against her, and (3) modifying custody to joint legal and physical custody, and as a result, also modifying child support and child-related expenses.

## IV. STANDARD OF REVIEW

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Vyhlidal v. Vyhlidal*, 309 Neb. 376, 960 N.W.2d 309 (2021). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021).

## V. ANALYSIS

### 1. CONTEMPT

Civil contempt proceedings are instituted to preserve and enforce the rights of private parties to a suit when a party fails to comply with a court order made for the benefit of the opposing party. *Vyhlidal v. Vyhlidal, supra*. Willful disobedience is an essential element of civil contempt; "willful" means the violation was committed intentionally, with knowledge that the act violated the court order. *Braun v. Braun*, 306 Neb. 890, 947 N.W.2d 694 (2020). Outside of statutory procedures imposing a different standard or an evidentiary presumption, all elements of contempt must be proved by the complainant by clear and convincing evidence. *Krejci v. Krejci*, 304 Neb. 302, 934 N.W.2d 179 (2019). If it is impossible to comply with the order of the court, the failure to comply is not willful. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018). Willfulness is a factual determination to be reviewed for clear error. *Braun v. Braun, supra*.

In a civil contempt proceeding, for the sanction to retain its civil character, the contemnor must, at the time the sanction is imposed, have the ability to purge the contempt by compliance and either avert punishment or, at any time, bring it to an end. *Yori v. Helms*, 307 Neb. 375, 949 N.W.2d 325 (2020). The sanction in a civil contempt proceeding is both remedial and coercive, and when a jail sentence is imposed as a sanction, the contemnor must carry the keys to their jail cells in their own pocket. *Braun v. Braun, supra.* A jail sanction in a civil contempt proceeding is conditioned upon the contemnor's continued noncompliance with the court order, and the purge plan must allow the contemnor to mitigate or avoid the sanction through compliance. *Id.*

## (a) Willful Contempt

Angela first argues that the district court's factual determinations were clearly erroneous as the determinations of willfulness and credibility were inconsistent with the record. Angela asserts that the district court gave Andrew "the benefit of the doubt" despite him being a less credible witness and having "lied under oath multiple times" during the proceedings. Brief for appellant at 14. Angela also challenges her being held in contempt for acting in what she believed to be her child's best interests.

The district court resolved any factual disputes in Andrew's testimony in his favor, and it also specifically noted credibility concerns with both Lepard's and Drew's testimony. The court further noted that the record supported a finding of contempt even if it were to take all of Drew's testimony as true. Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Yori v. Helms, supra*. Accordingly, we find no clear error in the court's resolution of credibility issues.

Angela next argues that even if the district court's factual determinations were not clearly erroneous, the finding that she was in willful contempt was an abuse of discretion. Angela maintains that she did her best to comply with the parenting plan despite Andrew's "problematic conduct" including his routinely allowing Drew to decide whether to go to Andrew's home for his parenting time, Andrew's failure to show up for parenting time on occasion, and Andrew's failure to address Drew's mental health issues. Brief for appellant at 16. Angela points to Drew's anxiety and behavior problems to excuse her "emergency medical decision" to not force him to go on the 2019 Colorado vacation, fearing that such would create significant mental issues for him. Brief for appellant at 17. Angela further maintains that she had no choice but to give Drew's allegations of physical abuse some credence. In her arguments, Angela refers to some evidence about things that occurred after the court found her in contempt, but we have focused our review on only on the evidence adduced at the 2019 contempt proceeding.

As noted above, the district court resolved the conflicting evidence in Andrew's favor, and we have accepted the court's factual findings in this regard. Further, the evidence is clear that Andrew did not receive parenting time with Drew for an extended period beginning in about April 2019. Upon our review, we cannot say that the court erred in finding that Angela willfully violated the court order. Accordingly, the court did not abuse its discretion in finding Angela to be in contempt of court.

## (b) Sanctions

Next, Angela assigns error to the sanctions imposed by the district court, arguing that they were punitive, excessive, and an abuse of discretion. She compares the imposition of a jail sentence with a purge plan and assessment of attorney fees against her to the "slap on the wrist" imposed against Andrew. Brief for appellant at 20. Angela further points to the lack of evidence that she has sufficient income to pay this expense despite the court's finding that she has the capacity to work full time at minimum wage. Angela asserts that in order to comply with the sanctions, she would have to enter the job market at the peak of a global pandemic, and she is a person at high risk with a history of respiratory illness and immune deficiency. Angela does not direct us to evidence to supporting her argument about her health concerns, although we note that in the August

2020 hearing on Angela's motion for new trial, her attorney addressed similar arguments, stating "the reality is is [sic] a person at risk." Her attorney also argued that "with the current economic climate, it's simply not feasible for her to come up with a large sum by a short period" and that spreading the payment in installments would "make it more feasible for her to do so and address these issues."

Clearly, the district court considered the arguments presented at the new trial motion hearing; it modified the purge plan as described in the background section above. The court also determined Angela's contempt, which had resulted in Andrew not having parenting time for several months, was more egregious than Andrew's. We agree with the court's assessment and find no abuse of discretion in its imposition of sanctions against Angela.

## 2. MODIFICATION

Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). Modifying a custody or parenting time order requires two steps of proof. *Id.* First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id.* Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id.* Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently. *Id*.

### (a) Material Change in Circumstances

Angela does not challenge the district court's finding that a material change in circumstances had occurred in this case. Nevertheless, for the sake of completeness, we find the record supports such finding. The record reflects unanticipated changes in the relationship between Drew and Andrew beginning in April 2019 as well as in Drew's behavioral and mental health and school attendance. In addition, the record supports a finding of a material change of circumstances warranting the modification of child support given the modification of physical custody and the rebuttable presumption set forth in Neb. Ct. R. § 4-217 (variation by 10 percent or more of current child support obligation). Next, we turn to the second prong of the analysis, the best interests of the child.

### (b) Best Interests

When determining the best interests of the child in the context of custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). See Neb. Rev. Stat. § 43-2923(6) (Reissue 2016). Other relevant considerations include stability in the child's routine, minimalization of contact and conflict between the parents,

and the general nature and health of the individual child. *Jones v. Jones, supra*. No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case. *Id*.

Angela argues that the district court abused its discretion in finding that it was in Drew's best interests to modify custody and parenting time. Angela points to Drew's mental health issues, including ADHD, anxiety, and a mild learning disability. She asserts that she is the more empathetic and concerned parent, and is better able to deal with these issues. In contrast, she describes Andrew as verbally abusive toward Drew and dismissive of his struggles. In changing custody to joint physical custody with an alternating weekly schedule, Angela argues that the court disregarded Drew's struggles with school, as well as McNeese's expert testimony that a drastic change would be detrimental to Drew's best interests.

It is clear from the record that the parties have different parenting styles. It is also clear that Drew has many issues and that the parties will need to work together closely to successfully parent him. However, the record shows that counseling with the new therapist was going well and that the relationship between Drew and Andrew had already improved by the time of the modification trial. The week-on-week-off parenting time schedule had been working well during the summer of 2020, and while Angela expressed concerns about whether it would work as well during the school year, such a schedule will minimize the number of transitions Drew must make between households and provide consistency in his routine that was perhaps lacking following the addition of some mid-week parenting time in 2019. The parties have had an antagonistic relationship in the past, but they both testified that they could communicate effectively to parent Drew in the event of custody changes. And, finally, as noted previously, the district court resolved conflicting evidence in Andrew's favor, and we defer to its determinations in that regard. See *Yori v. Helms*, 307 Neb. 375, 949 N.W.2d 325 (2020). We find no abuse of discretion in the court's finding that a modification of custody and parenting time was in Drew's best interests.

### (c) Child Support and Related Expenses

Angela also asserts that the district court abused its discretion in modifying child support and child related expenses. Presumably, this portion of her assigned error was tied to her argument that the court abused its discretion in modifying custody and parenting time, and we have already found above that the court did not abuse its discretion in that regard. Angela does not present any arguments specifically addressed to this portion of her assignment of error, and we do not address it further, except to note that the cash medical support was ordered in 2015 because health insurance was not available at that time and it was clearly available at the time of the current modification trial. See *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021) (to be considered by appellate court, alleged error must be both specifically assigned and specifically argued in brief of party asserting error).

### 3. ANDREW'S REQUEST FOR ATTORNEY FEES

Before concluding, we note that Andrew argues in his brief that Angela's arguments are wrong in law and fact, without factual or legal support, and/or meritless or frivolous and that he should therefore receive an award of attorney fees under Neb. Rev. Stat. § 43-1412(3) (Reissue 2016). As a general rule, attorney fees and expenses may be recovered in a civil action only where

provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. Id. Attorney fees and costs are statutorily allowed in paternity and child support cases. *Wolter v. Fortuna*, 27 Neb. App. 166, 928 N.W.2d 416 (2019). See § 43-1412(3). Because Andrew is the prevailing party, he is entitled to attorney fees on appeal. Our rules of appellate procedure require those seeking the award of such relief to file a motion supported by an affidavit justifying the amount sought "no later than 10 days after the release of the opinion of the court or the entry of the order of the court disposing of the appeal, unless otherwise provided by statute." Neb. Ct. R. App. P. § 2-109(F) (rev. 2021). If Andrew wishes to pursue an award of attorney fees and costs under § 42-1412(3), he may file such a motion in accordance with the rule set forth above.

## VI. CONCLUSION

The district court did not abuse its discretion in finding Angela in contempt or in imposing sanctions against her. Likewise, it did not abuse its discretion in modifying custody and parenting time.

AFFIRMED.