IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


KEOGH V. COOK


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


LISA M. KEOGH, APPELLANT AND CROSS-APPELLEE,

V.

MICHAEL K. COOK, APPELLEE AND CROSS-APPELLANT.


Filed May 27, 2025.    No. A-24-426.


Appeal from the District Court for Buffalo County: JOHN H. MARSH, Judge. Affirmed in part, in part vacated.

Bergan E. Schumacher, of Bruner, Frank, Schumacher, Husak & Simpson, L.L.C., for appellant.

Shane M. Cochran, of Cochran Law, P.C., L.L.O., for appellee.


RIEDMANN, Chief Judge, and MOORE and ARTERBURN, Judges.

MOORE, Judge.

## INTRODUCTION

Lisa M. Keogh appeals from the paternity decree entered by the Buffalo County District Court. She challenges certain provisions regarding future parenting time and child support. Michael K. Cook cross-appeals, asserting error in the court's failure to award the parties joint custody of their child and calculate child support accordingly. For the reasons that follow, we affirm in part, and in part vacate.

## STATEMENT OF FACTS

Lisa and Michael were in a brief romantic relationship, resulting in the parties' son, Henry, born in July 2022.

- 1 -

On October 18, 2022, Lisa filed a complaint to establish paternity, custody, visitation, and support. In December, the parties entered into a temporary stipulation that provided for a division of parenting time during the upcoming "winter break" and for Michael to have parenting time every other weekend beginning in January. Michael subsequently filed an answer and counterclaim, admitting his paternity of Henry and seeking custody and child support. A second temporary order was entered on March 8, 2023, together with a temporary parenting plan, which provided for the parties to have joint legal custody, with sole physical custody to Lisa, subject to Michael's parenting time every other weekend from Thursday at 5:30 p.m. to Sunday at 5:30 p.m., 4 weeks of summer parenting time, and a division of holidays. Michael was ordered to pay temporary child support of $609 per month beginning March 1.

Trial was held over 2 days in February and March 2024. In addition to the parties, several family members and friends of the parties testified. Numerous exhibits were received in evidence, including income information for both parties, text messages, Facetime and video recordings, and photographs.

Lisa and Michael had known each other about 3 months when Lisa became pregnant with Henry. At that time, Lisa lived in Stuart, Nebraska, and Michael lived in Kearney, Nebraska. They attempted to make their relationship work after finding out Lisa was pregnant, and after Henry was born in October 2022, the parties and Henry would alternate spending time together in both Stuart and Kearney. That arrangement lasted until mid-December when, following a disagreement, the parties ended their relationship. The parties thereafter entered into the temporary agreements noted above, and they operated under the March 2023 temporary order until trial. At some point, Michael moved from Kearney to Atkinson, Nebraska, which is near Stuart.

According to Lisa, the temporary arrangement has "been good and it's been bad." Lisa indicated that Henry has adjusted to the schedule and "he's thriving," and she has been able to stay home with him the majority of time. On the other hand, Lisa testified that she and Michael "can't agree on anything," which "makes for a lot of arguments surrounding anything to do with Henry." Lisa stated that the Facetime calls that the parents are allowed to have with Henry are very stressful and the exchanges are very tense. She pointed to the voluminous exhibits containing the text, telephone, and video communications as examples of the difficulty she has with Michael. In some of the recorded conversations, Michael made derogatory comments and acted in aggressive ways toward Lisa in front of Henry. Lisa has felt threatened by Michael, especially by his alleged threat to take Henry away from her.

Lisa is opposed to sharing joint legal and physical custody. She outlined her concerns about sharing custody with Michael. Lisa described Michael as being argumentative, resentful, and manipulative. According to Lisa, she suggested they attend counseling to learn how to coparent but Michael declined. Shortly after Lisa filed her complaint, Michael advised Lisa that he did not think a joint custody arrangement would be good for Henry. Lisa testified that every communication between them about Henry results in disagreement, including about Henry's health care and feeding. Lisa does not think that she and Michael can make decisions together concerning Henry in the future. Despite Henry's young age, the parties have already disagreed on whether Henry should attend school in Stuart or Atkinson. Lisa also testified that Michael withholds information from her, such as who is caring for Henry when Michael is working or traveling and

where Michael is working. Michael also fails to respond to Lisa's questions regarding Henry when he is in Michael's care.

Lisa testified that she is opposed to equal parenting time as it would be "really chaotic" for Henry given the parties' different schedules and routines. She expressed concern about the parties' lack of communication and frequent arguments making it difficult to provide stability for Henry. Lisa indicated that she has given Michael additional parenting time at his request, but he still ends up "mocking" and arguing with her. According to Lisa, when they followed a 50/50 schedule in the summer months, there was still conflict. Lisa expressed concerns for Henry's safety, his bedtime routines, and his health care while in Michael's care. Lisa believes that Michael's desire to criticize her and his negative behaviors toward her outweighs any concern Michael has for Henry's best interests. Lisa is concerned that alternating weekly parenting time would be a drastic change and would be traumatic for Henry. Lisa submitted a proposed parenting plan that gave her sole legal and physical custody of Henry.

At the time of trial, Henry was 19 months old and had been living with Lisa at her mother's home on a farm acreage near Stuart. Lisa described the home as comfortable with plenty of space for Henry. Lisa and her siblings are in the process of renovating their grandmother's house where Lisa plans to live at some point. The house is located a short walk from the school in Stuart. Since his birth, Lisa has been providing for Henry's physical, emotional, and health care needs.

Lisa has a bachelor's degree in elementary and special education and was employed as a substitute teacher at Stuart Public Schools at the time of trial. She was working as a full-time teacher when she became pregnant; however, she left that position because she initially planned to move to Kearney. When the move did not work out, there was not an open teaching position in Stuart. Lisa hopes to teach again full time in Stuart when Henry is in school. When Lisa is working, her mother takes care of Henry, as she has done for several of her grandchildren. In addition to her mother, Lisa also has other family in the Stuart area who are close to Henry, and they often engage in family activities.

Lisa addressed her mental health status, as Michael had raised that as an issue. Lisa takes medication prescribed by a psychiatrist who she sees every 3 months. Although Lisa had a mental health episode resulting in hospitalization in 2019, Lisa indicated that she does not have concerns about her mental health now and that it does not impact her ability to be a good parent.

Lisa earns $120 per day as a substitute teacher. On average, she works 5 days per month, earning approximately $500 per month. In addition to substitute teaching, Lisa works on the family farm performing miscellaneous tasks such as mowing and collecting rents. Her hours of work vary depending on the season. She is paid $1,250 per month for her work on the farm. Although Lisa has health insurance for herself, for which she pays $244.74 per month, Henry's health insurance cost is covered by the State.

Travis Ludwig, the 7th through 12th grade principal at Stuart Public Schools and Lisa's brother-in-law, testified. He affirmed that Lisa is a reliable and professional substitute teacher, as well as a good mother to Henry. Travis' four children interact regularly with Henry. Lisa's mother has also provided day care to Travis' children, which care has been "topnotch." Tracy Ludwig, Lisa's sister, also testified. Tracy described Lisa as a very concerned, involved, loving, and gentle mother to Henry. Lisa takes good care of Henry's health and physical needs. Lisa also takes steps to meet Henry's social and emotional needs, including spending time with the extended family and

on public outings. Tracy has noticed that when Henry returns from parenting time with Michael, Henry is very clingy with Lisa. Tracy has been present during several Facetime calls from Michael and observed him yelling at Lisa in front of Henry. On one occasion, he yelled at Tracy's young daughter who was present at the time.

Priscilla Keogh, Lisa's mother, testified about Lisa's care of Henry and their daily routine. She described the relationship between Lisa and Henry as "pretty tight." Priscilla confirmed that she cares for Henry when Lisa is either teaching or working on the farm. Priscilla has overheard phone calls between Lisa and Michael; Priscilla described Michael as having a temper and "he gets a little nasty." Michael calls Lisa names, including "liar," while Henry is nearby. Priscilla has accompanied Lisa and Henry on exchanges with Michael. On one occasion, he "flipped [them] off."

Lisa's older sister, Laurie Keogh, testified that Lisa is an "amazing mom." She described Lisa as very organized, providing a good schedule for Henry. Lisa integrates educational components into her playtime with Henry. According to Laurie, Lisa is very nurturing toward Henry. Laurie also has overheard conversations between Lisa and Michael in which he yells, berates, and harasses Lisa. Laurie described one particular parenting time exchange on Memorial Day weekend 2023, when Henry was less than 1 year old, in which Michael threw Henry's bag, yelled and said inappropriate things in front of Henry, and would not give Henry to Lisa. When Henry reached for Lisa, Michael jerked Henry back and "his head slammed back." After the exchange, Michael was honking his horn, swerved his car toward theirs, and "showed" his middle finger. Laurie was scared for their safety during this exchange and was ready to call the 911 emergency dispatch service.

Michele Vinton (Michele), Michael's sister, testified that Michael is "really good" with Henry; he interacts and plays with him and reads him books. Michele had minimal contact with Lisa, but thought she was overprotective of Henry and tense when he was a newborn infant. Michele believes that Michael should have equal parenting time with Henry.

Jason Fritzen (Jason), a former neighbor to Michael in Kearney, testified about Michael's interactions with Jason's children, which were "very good." Jason described Michael as responsible, trustworthy, honest, and caring. Jason has observed Michael's parenting of Henry on a few occasions. Jason described Michael as engaged and a good parent. Cheryl Griesen (Cheryl) became acquainted with Michael when he lived in Kearney, and they have been friends since approximately 2017. Cheryl has observed Michael with Henry about six times, three of which were when Cheryl provided care for Henry at Michael's home while Michael was working. Cheryl described Michael's home as very clean and Michael as a "great dad." Another friend and former coworker of Michael, Nathan Dahlin (Nathan), testified. Michael lived with Nathan for a brief period of time after he sold his home in Kearney. Nathan has observed Michael with Henry and described him as a "good parent." Michael plays with Henry, teaches him words, and reads to him. Nathan accompanied Michael on a few parenting time exchanges, which he described as tense. He observed Lisa standing close to Michael when he is getting Henry out of the vehicle.

Stephanie McGrew (Stephanie) has known Michael for about 10 years; she met Michael through her husband. Stephanie lives in Atkinson, and since Michael has moved there she sees him on a weekly basis. She described Michael as very loyal, caring, and supportive. She sees Michael with Henry one to two times per month. Stephanie described Michael as a "very good

father"; he makes sure that Henry has everything that he needs and provides a well-balanced diet to Henry. She observed Michael play ball with Henry, read him books, go for walks, and take him to the swimming pool. Henry appears happy around Michael and is always clean and well dressed. According to Stephanie, Michael and Henry have a "really strong" bond.

Stacy Cook, Michael's mother, lives in Ogallala, Nebraska, with her husband, Michael's father. Stacy testified that she observes Michael with Henry on Facetime calls every other week when Michael has parenting time, and she also sees them together in person on occasion. Stacy observes Michael trying to teach Henry things, playing with him, and providing the necessary care for him. Stacy described Lisa as possessive with Henry. Stacy described Michael as a "very good dad . . . very caring" and believes that Michael should have equal time with Henry.

Michael was living in Kearney at the time of Henry's birth. He attended Henry's birth and remained with Lisa and Henry for a few days afterwards. After that, he would return on the weekends to see Henry; after about 4 or 5 weeks, Lisa would bring Henry to Kearney, and they would alternate spending time together in Kearney and Stuart. They followed this schedule until December 2022. During the time that Michael and Lisa were together, Michael shared in the care of Henry, including feeding, changing diapers, and helping with his bath.

Michael now lives in Atkinson, roughly 5 miles from Lisa. Michael moved there to be closer to Henry and spend more time with him. At the time of trial, Michael was not employed but had a verbal employment offer from an equipment company. He voluntarily left his prior employment in Kearney with Farm Bureau when he chose to move closer to Henry. He has continued to do some spraying work and has been working on renovating his house. Michael agreed to use his prior earnings in determining child support.

Michael described Henry as happy and strong. Michael described a typical day of caring for Henry, including feeding him, dressing him, playing with him, having an afternoon nap, bathing, and getting ready for bedtime. Michael tries to keep Henry on a regular schedule. Michael has been teaching Henry sign language.

Michael agreed that the parties have had difficulty communicating and making decisions some of the time, but he also felt that they had the ability to cooperate in raising Henry. Michael admitted that he had made some inappropriate comments to Lisa but expressed that he was frustrated with her attempts to control and limit his parenting time. Michael described Lisa as "overbearing." Regarding the Memorial Day 2023 exchange, he admitted that he said things he should not have in front of Henry, but said he was frustrated with Lisa's "badgering." Michael pointed to instances in which he and Lisa have been able to cooperate in scheduling extra parenting time and appointments. He also testified that he sends Lisa pictures and videos of what Henry is doing and learning when he is with Michael.

Michael believes that it is in Henry's best interests for the parties to have a 50/50 physical custody arrangement. Although Michael testified in his deposition that Lisa was not a good parent, he explained at trial that this comment was reflective of her having withheld Henry from him for 17 days. At trial, Michael agreed that Lisa cares for Henry.

The district court entered a decree on March 19, 2024. The court awarded legal and physical custody to Lisa, ordered Michael to pay child support of $616 per month, and included a parenting plan. Michael was awarded parenting time every other weekend beginning at 5:30 p.m. on Thursday and ending at 5:30 p.m. on Sunday, until the child is enrolled in preschool. Once the

child is enrolled in preschool, Michael was awarded additional parenting time every week beginning at the release of school or 3:30 p.m. (whichever is earlier) until 7 p.m. on Tuesday evenings. The parenting plan also provided Michael with 6 weeks of summer parenting time and provided for the division of holidays.

In the decree, the district court made certain findings regarding custody. The court found that Lisa has been the primary caretaker for Henry. The court further found that the evidence supported Lisa's position that the parties cannot communicate effectively or coparent, and the court placed legal custody with Lisa. However, the court found Lisa's arguments against equal parenting time "less convincing." Although Lisa expressed concern that shared physical custody would result in a chaotic life for Henry, the court found that Henry's routine will change upon his entering school and that school attendance would provide consistency in Henry's routine. The court therefore found that the parties shall alternate custody on a weekly basis following the Labor Day holiday in 2027. The court also found that beginning September 1, 2027, Michael's child support obligation would be reduced to $184 per month, using the joint custody child support calculation.

Lisa appeals, and Michael cross-appeals.

## ASSIGNMENTS OF ERROR

Lisa assigns that the district court's order is conditional, speculative, and adverse to Henry's best interests and that the district court erred in granting Michael joint physical custody and modifying his child support beginning in September 2027. In his cross-appeal, Michael assigns error to the district court's failure to grant joint custody and calculate child support using the joint custody calculation at the time of the court's decree.

## STANDARD OF REVIEW

In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *Franklin M. v. Lauren C.*, 310 Neb. 927, 969 N.W2d 882 (2022).

## ANALYSIS

*Conditional Provisions of Decree.*

We combine Lisa's assignments of error to consider whether the district court's order, in which it made future provisions regarding parenting time and child support, amounts to a conditional judgment.

If a judgment looks to the future in an attempt to judge the unknown, it is a conditional judgment. A conditional judgment is wholly void because it does not "perform in praesenti" and leaves to speculation and conjecture what its final effect may be. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). The impact of potential events on a child's best interests and the proper judicial response to the potential events identified in the orders complained of are better assessed at the time of their occurrence. See *id*. Because there is a statutory allowance for modification in the future upon changed circumstances, a conditional judgment is not only unnecessary to resolve

the equities presented, but is contrary to an equitable resolution. See *Strunk v. Chromy-Strunk*, 270 Neb. 917, 708 N.W.2d 821 (2006).

In the decree, the district court granted Lisa sole physical custody with parenting time to Michael on alternating weekends, an additional weeknight when Henry begins preschool, and certain summer and holiday parenting time. It set Michael's child support at $616 per month, using the standard child support calculation chart. However, the court went on to determine that in September 2027, which the court believed would be when Henry begins regular school attendance, the parties are to alternate parenting time on a weekly basis. The court also determined that the child support should be modified at this time to use the joint custody calculation chart, thus reducing Michael's child support obligation to $184 per month.

We note that the district court did not specifically provide that the prospective September 2027 modification resulted in a joint physical custody award. However, as noted by the Nebraska Supreme Court in *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 948, 932 N.W.2d 692, 705 (2019), "it is the trial court's allocation of parenting time that drives the physical custody label, not the other way around." The court in *State on behalf of Kaaden S.* determined that the trial court effectively imposed a joint physical custody arrangement by creating a week-on-week-off parenting time schedule.

We appreciate that the district court may have been attempting to avoid a modification proceeding with these parties in a few years' time. And to the extent the court cited a certain "event" in the future, when the court believed Henry would reach school age in September 2027, the order may not be conditional in the traditional sense. However, we agree with Lisa that the provisions that modify the parenting time and child support in the future are based upon speculative considerations. First, the court's assumption that Henry will begin school in September 2027 is in itself speculative. Further, while it is possible that circumstances could change upon Henry's reaching school age, the future circumstances of the parties and what will be in Henry's best interests at that time are unknown. The determination of Henry's best interests upon the occurrence of a future change in circumstances can be better assessed at the time of their occurrence. See *Vogel v. Vogel, supra*. We therefore vacate the portions of the decree that modified parenting time and child support in September 2027. We note that the right of parenting time is subject to continual review by the court, and a party may seek modification of a parenting time order on the grounds that there has been a material change in circumstances. See *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021).

*Cross-Appeal.*

Michael argues that the district court abused its discretion in failing to order joint custody in the decree and failing to utilize the corresponding joint custody child support calculation chart.

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides that in determining parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the relationship of the minor child to each parent; the desires and wishes of the minor child if of an age of comprehension and when based on sound reasoning; the general health, welfare, and social behavior of the minor child; credible evidence of abuse inflicted on any family or household member; and credible evidence of child abuse or neglect or domestic partner abuse. Other relevant considerations include stability in the child's routine,

minimalization of contact and conflict between the parents, and the general nature and health of the individual child. See *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case. *Id*. The one constant is that the child's best interests are always the standard by which any custody or parenting time determination is made. *Id*. In addition, in devising a parenting plan, quality contact between children and their parents should be emphasized. See, also, § 43-2923(3).

Custody of a minor child may be placed with both parents on a joint legal custody or joint physical custody basis, or both, if the court specifically finds, after a hearing in open court that joint physical or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent. See Neb. Rev. Stat. § 42-364(3) (Cum. Supp. 2024). Although joint physical custody generally should be reserved for those cases where the parties can communicate and cooperate with one another, a court may order joint custody in the absence of parental agreement, if after a hearing in open court, it finds that such custody is in the child's best interests. See *Leners v. Leners*, 302 Neb. 904, 925 N.W.2d 704 (2019), *disapproved on other grounds, State on behalf of Kaaden S. v. Jeffery T., supra.* With regard to joint legal custody, the district court found that the parties had difficulty communicating with one another and in coparenting Henry, which finding is supported by the record. We find no abuse of discretion in the district court's award of sole legal custody to Lisa.

With regard to physical custody and Henry's best interests, the parties' difficulty in communication and coparenting is also a factor to consider. During the pendency of the action, the parties have been unable to integrate their individual parenting styles into a cohesive approach to parenting Henry. However, the record shows that Henry has been well taken care of by both parents and that he is a healthy and happy young child. Although the record supports the district court's finding that Lisa has been the primary caretaker of Henry since his birth, Michael has been a very involved parent, faithfully exercising his parenting time. Michael has been clear in his desire to have more time with Henry and to be a joint custodian.

Lisa and Michael only had a few months together after Henry's birth before their personal relationship deteriorated, and they have not been able to establish an amicable coparenting relationship since then. Lisa has shown a tendency to be overprotective of Henry, and Michael has exhibited anger and frustration over Lisa's unwillingness to share custody and her attempts to control his parenting time. Much of the evidence and the testimony of the parties was an effort to criticize the other. However, it is clear that both parties love Henry, provide good care to him, and are fit parents.

With regard to other best interests factors to consider, given Henry's young age, there is no evidence regarding his preference, nor is there credible evidence of any abuse inflicted by either of the parties.

While Michael has faithfully exercised his parenting time, has taken good care of Henry, and has shown significant interest in being more involved in Henry's life, in our de novo review of the record, we cannot say that the district court abused its discretion in finding that it was in Henry's best interests to award Lisa sole legal and physical custody, subject to Michael's parenting time as set forth in the parenting plan. As noted above, Lisa has been the primary caretaker of

Henry since his birth, and she has structured her working life to be available to care for him during the remaining years before he reaches school age.

## CONCLUSION

The portions of the district court's decree modifying parenting time and child support in September 2027 are vacated; the remainder of the decree is affirmed.

AFFIRMED IN PART, IN PART VACATED.